# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **MICHAEL GARY PARKER, JR.,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 22-CV-0340-GKF-SH** |
| | ) | |
| **JOHN MASQUELIER, Warden,**[1] | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>OPINION AND ORDER</u>

Petitioner Michael Gary Parker, Jr., a self-represented prisoner,[2] petitions for a writ of habeas corpus under 28 U.S.C. § 2254, challenging the lawfulness of his custody under the criminal judgment entered against him in Tulsa County District Court Case No. CF-2018-3184. Having considered the petition (Dkt. 1), the response (Dkt. 9), the reply (Dkt. 16),[3] state court records (Dkts. 9-1 through 9-24; Dkt. 10), and applicable law, the Court finds and concludes that

---

[1] Parker is incarcerated at the James Crabtree Correctional Center. *See* Oklahoma Offender Lookup, https://okoffender.doc.ok.gov (query: ODOC # 832555), last visited August 20, 2025. The Court substitutes the current warden of that facility, John Masquelier, in place of Carrie Bridges as party respondent. Fed. R. Civ. P. 25(d); Rule 2(a), *Rules Governing Section 2254 Cases in the United States District Courts*. The Clerk of Court shall note on the record this substitution.

[2] Because Parker appears without counsel, the Court liberally construes his filings but does so without assuming the role of an advocate. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[3] Parker filed two nearly identical replies but signed only one. Dkts. 13, 16. The Court considers only the signed reply that was filed January 13, 2023. Dkt. 16.

no evidentiary hearing is necessary[4] and that the petition shall be denied.[5]

## BACKGROUND

### I.     Factual background[6]

On July 22, 2018, Parker fatally shot John Wilson outside a Tulsa after-hours club.  The two were not acquainted, but had been involved in an altercation at a different club, the 007 Club, earlier that evening.  The prosecution theorized that Parker, angry and upset over his altercation with Wilson, went home, armed himself, drove to the after-hours club, and intentionally shot Wilson who, though armed, was not acting in a threatening manner.  Two witnesses to the shooting testified Wilson was not acting in a threatening manner and the shooter targeted him.

Parker, on the other hand, insisted that he acted in self-defense.  He claimed after his altercation with Wilson at the 007 Club, he had his cousin, Patrick Tolon, take him home because he was upset.  On the way, he reluctantly agreed to accompany Patrick and their cousin, Roosevelt Tolon, to an after-hours spot.  Parker grabbed his handgun from his home for protection and drove himself to the after-hours club because his cousins were convicted felons and were not permitted to be in cars with firearms.  Parker, who claimed he did not anticipate seeing Wilson again that evening, glimpsed Wilson just after his arrival at the after-hours club.  Parker testified that Wilson began approaching and cussing him in the club parking lot.  Parker said Wilson reached for his pocket and Parker assumed he was going

---

[4] As explained in the discussion section of this opinion, 28 U.S.C. § 2254(d) bars relief as to nearly all claims presented in the petition and Parker procedurally defaulted portions of some claims.  Under these circumstances, the Court denies Parker's request for an evidentiary hearing.  *See Shinn v. Ramirez*, 596 U.S. 366, 381-82 (2022) (discussing "narrow" exceptions in 28 U.S.C. § 2254(e)(2) that permit an evidentiary hearing when a petitioner fails to develop the factual record in state court); *Cullen v. Pinholster*, 563 U.S. 170, 185 (2011) ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court."); *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").

[5] On August 11, 2025, and September 5, 2025, Parker moved this Court to adjudicate his petition without further delay.  Dkts. 25, 26.  Because this opinion and order adjudicates the petition, the Court denies as moot Parker's motions to expedite ruling.

[6] The following summary of facts is drawn from the published opinion of the Oklahoma Court of Criminal Appeals ("OCCA") affirming Parker's criminal judgment on direct appeal.  *See* 28 U.S.C. § 2254(e)(1) (providing that determinations of factual issues made by a state court shall be presumed correct absent clear and convincing evidence to rebut that presumption).  The Court develops additional facts relevant to Parker's claims in the discussion section.

for the gun he had seen Wilson with earlier.  Parker drew his own gun from his waistband and fired four shots, killing Wilson.

*Parker v. State*, 495 P.3d 653, 657-58 (Okla. Crim. App. 2021).

## II.    Procedural background

Following an investigation, the State charged Parker with first-degree murder, in violation of Okla. Stat. tit. 21, § 701.7A.  Dkt. 10-12 at 21.[7]  Parker's case was tried to a jury, Parker did not contest that he shot Wilson, and "[t]he issue at trial was whether Parker shot Wilson with malice aforethought, in a heat of passion, or in self-defense."  *Parker*, 495 P.3d at 658.  The jury found Parker guilty of first-degree manslaughter (heat of passion) but could not reach a unanimous verdict as to punishment.  Dkt. 10-8 at 147-48.  After considering a presentence report, letters of support submitted on Parker's behalf, and oral arguments, the trial court imposed a term of twenty years' imprisonment with the last three years to be served on supervised probation.  Dkt. 10-10 at 1-10; Dkt. 9-2.

Parker appealed, raising six claims.[8]  Dkt. 9-4.  While his appeal was pending, the United States Supreme Court held that the land within the boundaries of the Muscogee Creek Nation Reservation is "Indian country" for purposes of the Major Crimes Act, 18 U.S.C. § 1153 ("MCA"); and stated that, as provided in the MCA, "[o]nly the federal government, not the State, may prosecute Indians for major crimes committed in Indian country."  *McGirt v. Oklahoma*, 591 U.S.

---

[7] Unless otherwise indicated, the Court's citations to the record refer to the CM/ECF header pagination.

[8] Parker's counseled appellate brief asserted claims alleging:  (1) the State failed to prove beyond a reasonable doubt that he was not acting in self-defense; (2) the trial court erroneously instructed the jury on first-degree manslaughter; (3) the State used peremptory challenges in a discriminatory manner, depriving him of an impartial jury and equal protection of the law; (4) the trial court erroneously denied his motion to suppress coerced statements he made to a detective after his arrest; (5) prosecutorial misconduct deprived him of a fair trial; and (6) trial counsel provided constitutionally deficient representation.  Dkt. 9-4 at 3-4.

894, 913, 924, 932 (2020).   Parker subsequently obtained leave from the OCCA to file a supplemental brief asserting a seventh claim challenging the State's exercise of criminal jurisdiction over his prosecution.[9]  Dkts. 9-6, 9-7, 9-8.  Following a remand for an evidentiary hearing on the jurisdiction claim, the trial court submitted findings of fact and conclusions of law to the OCCA, and Parker and the State filed supplemental appellate briefs.  Dkts. 9-9, 9-11 through 9-14.  Ultimately, the OCCA denied relief on all claims and affirmed Parker's judgment and sentence.  *Parker*, 495 P.3d at 658-67.  Parker did not seek further direct review.  Dkt. 1 at 3. Parker applied for postconviction relief, asserting three claims.[10]  Dkt. 9-18.  The state district court denied the application, Parker filed a postconviction appeal, and the OCCA affirmed.  Dkts. 9-19, 9-22.

Parker now seeks federal habeas relief, reasserting six claims that he presented in state court.  Dkt. 1.  Respondent contends that the petition should be denied because portions of some claims are not properly exhausted and thus are procedurally barred and 28 U.S.C. § 2254(d) precludes relief as to each properly exhausted claim.  Dkt. 9.

## DISCUSSION

A federal court may grant habeas relief only if a state prisoner "is in custody in violation

---

[9] Parker's counseled supplemental appellate brief asserted that Parker is an Indian, that he committed his crime of conviction in Indian country, and that, under the MCA, only the federal government had jurisdiction to prosecute him.  Dkt. 9-8 at 1-15.  He also supplemented his sixth claim, alleging that trial counsel was ineffective for failing to challenge the State's improper exercise of criminal jurisdiction.  *Id.* at 15.

[10] Parker's pro se application for postconviction relief asserted claims alleging:  (1) his "sentence is void ab initio because the State of Oklahoma lacked subject matter jurisdiction to prosecute"; (2) "appellate counsel was ineffective for failing to raise pertinent jurisdictional issues on direct appeal"; and (3) "appellate counsel was ineffective for failing to adequately raise [his] claim of ineffective assistance of trial counsel and for failing to address and raise other relevant pertinent issues during direct appeal."  Dkt. 9-18 at 3, 13, 20.

of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). But "[a] state prisoner must exhaust available state remedies before presenting his claim to a federal habeas court." 28 U.S.C. § 2254(b)(1)(A); *Davila v. Davis*, 582 U.S. 521, 527 (2017).[11] And the scope of federal habeas review depends on how the state court resolved the federal claim.

If the state court denied the federal claim after a merits adjudication, a federal court may grant habeas relief only if the state prisoner first shows that the state court's adjudication of the claim resulted in a decision that either (1) is "contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), or (2) is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). The prisoner "carries the burden of proof" in satisfying these standards. *Pinholster*, 563 U.S. at 181. When a claim is subject to review under § 2254(d)(1), a federal court must determine (1) whether clearly established federal law—i.e., "something akin to [an] on-point holding[]" by the Supreme Court, exists and, if so, (2) whether the state court either (a) decided the federal claim in a manner that is contrary to the Supreme Court's holding or (b) applied that law to the facts of the case in an objectively unreasonable manner. *House v. Hatch*, 527 F.3d 1010, 1015-19 (10th Cir. 2008). A state court decision is objectively unreasonable only if it "is so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). Under § 2254(d)(2), habeas review focuses on the state court's determination of the facts relevant

---

[11] The AEDPA imposes a one-year statute of limitations and requires a state prisoner to exhaust available state remedies before seeking federal habeas relief. 28 U.S.C. §§ 2244(d)(1), 2254(b)(1)(A). Respondent does not contest the petition on timeliness grounds. Dkt. 9 at 3. Respondent does, however, argue that portions of some claims are unexhausted or otherwise procedurally barred. *Id.* at 3, 60 n.31, 75-80, 112 n.49. The Court addresses these procedural arguments below.

to the federal claim. *House*, 527 F.3d at 1015, 1019. But "[t]he standard for determining whether the state court's decision was based on an unreasonable determination of the facts 'is a restrictive one.'" *Frederick v. Quick*, 79 F.4th 1090, 1104 (10th Cir. 2023) (quoting *Grant v. Trammell*, 727 F.3d 1006, 1024 (10th Cir. 2013)), *cert. denied*, 144 S. Ct. 2634 (2024). A federal court "must defer to the state court's factual determinations so long as 'reasonable minds reviewing the record might disagree about the finding in question." *Smith v. Duckworth*, 824 F.3d 1233, 1241 (10th Cir. 2016) (quoting *Brumfield v. Cain*, 576 U.S. 305, 314 (2015)).

If the state court denied the federal claim based on an independent and adequate state procedural rule, the federal claim is technically exhausted but procedurally defaulted for purposes of federal habeas review. *Davila*, 582 U.S. at 527; *Coleman v. Thompson*, 501 U.S. 722, 732 (1991), *modified on other grounds by Martinez v. Ryan*, 566 U.S. 1 (2012). A federal court also may treat a federal claim as procedurally defaulted if the state prisoner did not properly exhaust that claim in state court, and the federal court finds that a state court likely would apply a state procedural rule to deny relief on the unexhausted claim in any successive state postconviction proceeding. *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006) (stating that "[i]n habeas, the sanction for failing to exhaust properly (preclusion of review in federal court) is given the separate name of procedural default"); *Anderson v. Sirmons*, 476 F.3d 1131, 1139 n.7 (10th Cir. 2007) ("'Anticipatory procedural bar' occurs when the federal courts apply procedural bar to an unexhausted claim that would be procedurally barred under state law if the petitioner returned to state court to exhaust it." (quoting *Moore v. Schoeman*, 288 F.3d 1231, 1233 n. 3 (10th Cir. 2002))). A federal court may not review, much less grant habeas relief on, a procedurally defaulted claim unless the state prisoner first shows either cause for the procedural default and actual prejudice from the alleged constitutional error or that the federal court's failure to review the claim will

result in a fundamental miscarriage of justice.  *Davila*, 582 U.S. at 527; *Coleman*, 501 U.S. at 750; *see also McQuiggin v. Perkins*, 569 U.S. 383, 392-93 (2013) (explaining that, under the miscarriage of justice exception, "a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims  . . . on the merits notwithstanding the existence of a procedural bar to relief"); *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (reasoning that "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule").

Even if a prisoner either satisfies § 2254(d)'s preconditions to relief or makes the showings necessary to overcome the procedural default of a federal claim, a federal court need not grant habeas relief.  *See Brown v. Davenport*, 596 U.S. 118, 134 (2022) ("While AEDPA announced certain new conditions to relief, it did not guarantee relief upon their satisfaction.").  Rather, the federal court will review the claim de novo and, if the court finds a constitutional error, "must assess [its] prejudicial impact . . . under the 'substantial and injurious effect' standard set forth in *Brecht* [*v. Abrahamson*, 507 U.S. 619 (1993)]."  *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007); *see Fontenot v. Crow*, 4 F.4th 982, 1060-61 (10th Cir. 2021) (noting that federal courts apply de novo review when federal claims, including procedurally defaulted claims, "were not decided on the merits" in state court and that under de novo review "state-court factfinding still receives the benefit of the doubt under § 2254(e)(1)").  Under the *Brecht* standard, a federal court will grant habeas relief only if the court "is in grave doubt as to the harmlessness of an error that affects substantial rights."  *O'Neal v. McAninch*, 513 U.S. 432, 445 (1995).  Ultimately, to obtain habeas relief, the prisoner "must . . . persuade a federal habeas court that 'law and justice require' relief."  *Davenport*, 596 U.S. at 134 (quoting 28 U.S.C. § 2243).

With these standards in mind, the Court turns to Parker's claims.

## I.       Claim one:  improper exercise of criminal jurisdiction

Parker claims the State violated his Fourteenth Amendment right to due process because he is an Indian (a descendant of a Cherokee Freedman),[12] he committed his crime of conviction within Indian country (the Cherokee Nation Reservation), and the State improperly exercised criminal jurisdiction to prosecute him for a crime enumerated in the MCA.  Dkt. 1 at 7-17, 165-69.

### A.       Additional facts and OCCA decisions

Before considering this claim, the OCCA remanded the matter to the state district court for an evidentiary hearing on two issues:  (1) whether Parker is an Indian for purposes of federal jurisdiction under the MCA, and (2) whether the crime occurred in Indian country.  *Parker*, 495 P.3d at 664; Dkt. 9-9.  In its remand order, the OCCA directed the state district court to determine Indian status by determining (1) whether Parker has some Indian blood, and (2) is recognized as an Indian by a tribe or the federal government.  Dkt. 9-9 at 3.  Following the evidentiary hearing, the state district court submitted written findings of fact and conclusions of law.  Dkt. 9-11.  Applying the two-part test identified by the OCCA, the state district court determined that Parker's

---

[12] As the OCCA explained in its published opinion:

> The Cherokee Freedmen were former African-American slaves, owned by members of the Cherokee Nation, who were freed after Emancipation.  After the Civil War, the tribe granted Freedmen tribal citizenship.  In 2007, [the Cherokee Nation] amended [its] tribal constitution, making "Indian blood" a requirement for citizenship and stripped Freedmen of their membership.  In 2017, a federal court ruled that Cherokee Freedmen had citizenship rights and the Cherokee Nation again granted citizenship rights to Freedmen.  *Cherokee Nation v. Nash*, 267 F. Supp. 3d 86 (D.D.C. 2017).

*Parker*, 495 P.3d at 664 n.9.

evidence—including evidence that his "family history is intertwined with the Cherokee experience," that his mother became an enrolled member of the Cherokee Nation as a Cherokee Freedman in 2019, and that he was eligible for enrollment and actively seeking enrollment in the Cherokee Nation at the time of the evidentiary hearing—did not show that he was recognized as an Indian by the Cherokee Nation or the federal government when he committed the crime for which he was convicted. Dkt. 9-11 at 6-9. The state district court thus concluded that Parker was not an Indian for purposes of federal prosecution under the MCA. *Id.* at 9.[13]

The OCCA described Parker's claim as "turn[ing] on the district court's resolution of the first question, namely, Parker's Indian status" and noted the "test" for determining that status "is often referred to as the *Rogers* test because it is derived from *United States v. Rogers*, 45 U.S. 4 How. 567, 11 L. Ed. 1105 (1846)." *Parker*, 495 P.3d at 664 & n.8. Giving "great deference" to the state district court's factual findings and reviewing its legal conclusions "without deference," the OCCA stated:

> A defendant's Indian status or that of a crime victim is an essential element of an MCA offense and must be proved by the prosecution in order to have federal jurisdiction over crimes committed by or against Indians in Indian Country. As the United States Court of Appeals for the Tenth Circuit has explained:
>
> The term "Indian" is "not defined in . . . statutes addressing criminal

---

[13] Parker alleges he "was not allowed by appellate counsel, to attend the evidentiary hearing" and thus was deprived of his Fourteenth Amendment right "to present prima facie evidence during this critical stage of the proceedings." Dkt. 1 at 9; *see also* Dkt. 16 at 28 ("Appellate counsel waived the Petitioner's right to appear at two separate hearings, where he could have presented evidence, that he was recognized as an Indian prior to the alleged crime."). The transcript of the evidentiary hearing, however, shows that Parker appeared at the evidentiary hearing by telephone, that his appellate counsel appeared in person, and that appellate counsel submitted evidence and argument to support his jurisdiction claim. Dkt. 10-11. Appellate counsel had waived Parker's appearance at a prior hearing on his motion for a continuance to obtain DNA testing to prove that he has some degree of Indian blood. *Id.* at 3. At that prior hearing, the trial court denied Parker's request for a continuance and determined that it would proceed with the evidentiary hearing to determine whether Parker could establish that he is recognized as an Indian by a tribe or the federal government. *Id.* at 3-4.

jurisdiction in Indian country," so we have adopted a two-part evidentiary test to determine whether a person is an Indian for the purposes of federal law. To find that a person is an Indian the court must first make factual findings that the person has "some Indian blood" and, second, that the person is "recognized as an Indian by a tribe or by the federal government." A person satisfies the definition only if both parts are met; conversely the government can prove that a person is not Indian by showing that he fails either prong. This test, moreover, applies to determine the status of both a perpetrator or a victim of a crime in Indian Country.

[*United States v. Diaz*, 679 F.3d 1183,] 1187 [(10th Cir. 2012)] (citations omitted). *See also* [*United States v. Prentiss*, 273 F.3d 1277,] 1280 [(10th Cir. 2001)]; *Goforth* [*v. State*], 1982 OK CR 48, ¶ 6, 644 P.2d at 116. This Court applies the same Indian status test used by the Tenth Circuit, our federal circuit.

It is settled law that a person may be an Indian for purposes of federal criminal jurisdiction even if he or she is not formally enrolled in any tribe. *See United States v. Bruce*, 394 F.3d 1215, 1224-25 (9th Cir. 2005) (citing numerous cases holding that lack of enrollment is not determinative of recognition); *United States v. Drewry*, 365 F.3d 957, 961 (10th Cir. 2004), *vacated on other grounds by Drewry v. United States*, 543 U.S. 1103, 125 S. Ct. 987, 160 L. Ed. 2d 1015 (2005) (affirming tribal enrollment is not the only way to prove a person is Indian for federal criminal jurisdiction); *St. Cloud v. United States*, 702 F. Supp. 1456, 1461 (D.S.D. 1988) (accepting a person may still be an Indian though not enrolled with a recognized tribe). Nevertheless, he or she must still show that at the time of the offense, he or she was recognized as an Indian by a tribe or by the federal government. This is often done through production of his or her tribal membership documents/card showing that individual as a member of a particular tribe. *Diaz*, 679 F.3d at 1187. Recognition might also be proved through a Certificate Degree of Indian Blood card (CDIB) showing the defendant's blood quantum. *Id.*

Parker, of course, presented no evidence of his tribal membership since he is not yet a member of the Cherokee Nation. Instead he presented evidence of his descent from Cherokee Freedmen as well as evidence of the complex history between the Freedmen and the Cherokee Nation. He contended this complex relationship accounted for his inability to present customary evidence of recognition. He advocated that recognition should be based on membership eligibility alone. Because his ancestry demonstrated a long-term familial affiliation with the Cherokee Nation, he maintained that this affiliation should be sufficient for recognition despite his personal lack of tribal enrollment or affiliation. Conversely, the State argued that recognition should be based exclusively on whether or not the person in question was enrolled in a federally recognized tribe at the time of the offense. The State maintained this bright-line rule is easy to apply, is necessary to avoid any notice issues, and is necessary to avoid any jurisdictional gap issue between the state and federal government.

10

Despite his ongoing effort to obtain membership, the district court found that Parker was not an Indian because he could not show the Cherokees recognized him as Indian either at the time of the crime or at the [time of the] evidentiary hearing. Although it accepted Parker's evidence of his descent from Cherokee Freedmen, the district court was unaware of any precedent in Oklahoma or the Tenth Circuit providing a criminal defendant's eligibility alone for tribal membership qualified him or her as an Indian for purposes of Indian Country jurisdiction. *Diaz*, *Prentiss*, and *Goforth*, *supra*.

Parker contends that being Indian is a binary, immutable state; one either is Indian or is not regardless of tribal membership. Thus, he maintains that the district court abused its discretion when it rejected his contention that evidence of his tribal eligibility coupled with evidence of his strong ancestral ties to the Cherokee Nation was sufficient to meet the recognition prong. His assertion is correct as a matter of racial fact, but is wrong as a matter of law, because the term "Indian" has a specific meaning within the ambit of federal criminal jurisdiction, one that includes both racial and political components of the Indian community.

While we have not had occasion to adopt factors to consider in determining recognition, the Tenth Circuit and other courts have identified four core factors, namely:

> 1) tribal enrollment; 2) government recognition formally and informally through receipt of assistance reserved only to Indians; 3) enjoyment of the benefits of tribal affiliation; and 4) social recognition as an Indian through residence on a reservation and participation in Indian social life.

*Bruce*, 394 F.3d at 1224; *Drewry*, 365 F.3d at 961. Parker's proof or lack thereof supporting recognition prompted the district court to observe that he had no evidence of participation in any type of cultural or social events with the Cherokee Nation or receipt of tribal services through family members. The district court noted that Parker's "familial affiliation with the Cherokee Nation appears to be a (sic) more of a recent discovery rather than a long-known cornerstone of [his] identity." It went on to reject Parker's claim that the complex relationship between the Cherokee Nation and Freedmen was responsible for his inability to present relevant evidence of recognition. The court ultimately refused to apply a different standard other than the prevailing law whose factors outline the commonly accepted proof establishing recognition.

In addressing recognition, the court in *St. Cloud* explained:

> Indian blood alone is not enough to warrant federal criminal jurisdiction because jurisdiction over Indians in Indian country does not derive from a racial classification but from the special status of a formerly sovereign people. *United States v. Antelope*, 430 U.S. 641, 646, 97 S. Ct. 1395, 1398-99, 51 L. Ed. 2d 701 (1977); F.

11

Cohen, Handbook of Federal Indian Law 19 (1982 ed.). The second prong of the *Rogers* test in essence probes whether the Native American has a sufficient non-racial link to a formerly sovereign people.

*St. Cloud*, 702 F. Supp. at 1461.

We agree, as the district court stated, that Parker's family history is intertwined with the Cherokee experience. Nevertheless, our examination of the record, like the district court's review, reveals that Parker presented no evidence of a link between himself and the Cherokee Nation. His tribal identity was not part of his upbringing and he did not participate in or affiliate with the tribe in any way until now. The test is whether a tribe recognized the defendant as Indian and here the answer is no. The primary factors courts examine for recognition personally link a defendant to a particular tribe. We find Parker's proof—consisting of evidence of descent from relatives enrolled in the Cherokee Nation long ago—is insufficient to satisfy the recognition prong of the Indian status test. We therefore hold the district court correctly applied controlling law and adopt its ruling.

*Parker*, 495 P.3d at 664-67 (footnotes omitted).

The OCCA also considered Parker's jurisdiction claim on postconviction appeal. The OCCA recognized that Parker again challenged the State's exercise of criminal jurisdiction in his application for postconviction relief, both as a substantive claim and as a basis to establish appellate counsel's ineffectiveness, and that he presented additional evidence to support his position that he is an Indian. Dkt. 9-22 at 2-3. The OCCA noted that the state district court "concluded that even with the additional evidence, [Parker] failed to show that he was recognized by the Cherokees at the time of the crime." *Id.* at 3.[14] The OCCA found the state district court

---

[14] With his application for postconviction relief, Parker presented evidence that he became an enrolled member of the Cherokee Nation in March 2021 and that he obtained DNA test results after the evidentiary hearing showing he possesses some degree of "North Native American ancestry." Dkt. 9-18 at 32-36. He also presented affidavits from family and friends who stated they recognized Parker as an Indian before 2018 and his own affidavit stating that he has lived within the boundaries of the Muscogee Creek Nation Reservation and the Cherokee Nation Reservation since birth, that he received a Covid-19 relief check from the Cherokee Nation (at some unidentified point in time), and that he has "always been affiliated with the Cherokee Nation through tribal descent" and through socialization with his mother and siblings all of whom are descendants of Cherokee Freedmen. *Id.* at 29-30, 37-43.

did not abuse its discretion "when it found evidence of [Parker's] Indian status lacking." *Id.* at 4. The OCCA also rejected an argument Parker appeared to raise for the first time on postconviction appeal, namely a treaty-based claim asserting that "the State has no jurisdiction to prosecute crimes that occur in the Cherokee Nation regardless of Indian status." *Id.* The OCCA reasoned that the treaties cited by Parker—the Treaty with the Cherokee, 1835, and the Treaty with the Cherokee, 1866—did not support his argument that the State lacks jurisdiction to prosecute crimes committed in Indian country by non-Indians. *Id.*

### B.    Analysis and conclusion

Parker contends the OCCA's adjudication of this claim is objectively unreasonable because he presented evidence to satisfy "both prongs" of the *Rogers* test. Dkt. 1 at 10-15. Respondent contends Parker's challenge to the State's allegedly improper exercise of criminal jurisdiction does not state a cognizable habeas claim because there is no "constitutional or other hook" that "makes a [jurisdiction] claim like [Parker's] redressable on habeas review." Dkt. 9 at 36-52. Alternatively, Respondent contends § 2254(d) bars relief because (1) there is no clearly established federal law holding "that states have no prosecutorial authority under the MCA" and (2) the OCCA reasonably applied the *Rogers* test and reasonably determined the facts when it rejected Parker's claim. Dkt. 9 at 28-36, 52-59.

The Court rejects Respondent's contention that claim one does not present a cognizable habeas claim. As Respondent acknowledges, *see id.* at 36-37, the Tenth Circuit, relying on Supreme Court precedent, has determined the "[a]bsence of jurisdiction in the convicting court is indeed a basis for federal habeas corpus relief cognizable under the due process clause." *Yellowbear v. Wyo. Att'y Gen.*, 525 F.3d 921, 924 (10th Cir. 2008); *see also Murphy v. Royal*, 875 F.3d 896, 966 (10th Cir. 2017) (concluding state court did not have jurisdiction to prosecute Indian

defendant for a murder committed in Indian country and directing federal district court to grant state prisoner's petition for writ of habeas corpus). Respondent's disagreement with *Yellowbear*'s interpretation of Supreme Court precedent does not persuade this Court that it has authority to overrule binding Tenth Circuit precedent. Dkt. 9 at 36-41. Applying *Yellowbear*, the Court construes claim one as a cognizable habeas claim asserting a Fourteenth Amendment due process violation.

Nonetheless, the Court agrees with Respondent that § 2254(d) bars relief.[15] The MCA provides, in relevant part, that "[a]ny Indian who commits against the person or property of another Indian or other person . . . murder [or] manslaughter . . . within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States." 18 U.S.C. § 1153(a). The Tenth Circuit recently explained that the MCA "has a limited scope," stating, "'[e]xcept for the offenses enumerated in the Major Crimes Act,' the Supreme Court has held, 'all crimes committed by enrolled Indians against other Indians within Indian country are subject to the jurisdiction of tribal courts.'" *United States v. Hopson*, ___ F. 4th ___, No. 23-5056, 2025 WL 2200975, at *7 (10th Cir. July 30, 2025)

---

[15] The Court also agrees with Respondent that, in adjudicating claim one under § 2254(d)'s framework, this Court is limited to consideration of the facts that were presented to the OCCA. Dkt. 9 at 26-28; *see Pinholster*, 563 U.S. at 181; 28 U.S.C. § 2254(d)(2). The Court, however, finds it appropriate to consider all evidence considered by the OCCA in reaching its decisions, including evidence that Parker became an enrolled citizen of the Cherokee Nation in 2021 and obtained DNA results after his evidentiary hearing. *See* Dkt. 9 at 52 (representing that the OCCA "became aware of this evidence" while Parker's direct appeal was pending and "acknowledge[d] the evidence" when it declined to reopen the appellate record). Respondent seems to suggest this evidence should not be considered because it was "not formerly made part of the state court record." *Id.* at 52 n.27. But Parker presented this evidence through his state postconviction proceeding, and the state district court and the OCCA expressly considered this evidence but found it failed to establish Parker's status as an Indian at the time of his offense. Dkts. 9-18, 9-19, 9-22. As a result, the Court finds this evidence is part of the state court record and properly before this Court.

(quoting *United States v. Antelope*, 430 U.S. 641, 643 n.2 (1977)). But, as the OCCA noted, neither the MCA nor related federal statutes define the term "Indian." *Parker*, 695 P.3d at 665. To fill that gap, federal courts apply the two-part test "derived from *United States v. Rogers*, 45 U.S. (4 How.) 567, 11 L. Ed. 1105 (1846)." *Prentiss*, 273 F.3d at 1280. Under that test, "the court must make factual findings that the defendant (1) has some Indian blood; and (2) is recognized as an Indian by a tribe or by the federal government." *Id.* (internal quotation marks and citation omitted). And, "[i]n a prosecution under the [MCA], the government must prove that the defendant was an Indian at the time of the offense with which the defendant is charged." *United States v. Zepeda*, 792 F.3d 1103, 1113 (9th Cir. 2015).

In adjudicating Parker's claim, the OCCA applied the *Rogers* test. *See Parker*, 495 P.3d at 664 & n.8; Dkt. 9-22 at 3. Thus, Parker cannot show that the OCCA's decision is contrary to clearly established federal law. Parker instead appears to contend the OCCA unreasonably applied the *Rogers* test to the facts of this case or made an unreasonable determination of the facts by ignoring evidence he presented in state court to show that he could satisfy the recognition prong. Dkt. 1 at 7-17. The record does not support Parker's contentions. Rather, the record shows that the OCCA remanded Parker's case to the state district court for an evidentiary hearing; Parker appeared by telephone and through counsel at the evidentiary hearing and presented evidence; the focus of the evidentiary hearing was whether Parker's evidence satisfied the recognition prong; that the state district court received and considered Parker's evidence before issuing written findings of fact and conclusions of law; that the state district court again considered Parker's evidence regarding Indian status when it denied his application for postconviction relief, albeit under the framework of an ineffective assistance of appellate counsel claim; and the OCCA on direct appeal and, to a lesser extent on postconviction appeal, considered the totality of the

evidence presented in state court and found that Parker was not recognized as an Indian by a tribe or the federal government when he committed his crime of conviction. *See* Dkts. 9-9, 9-11, 9-19, 9-22, 10-11; *Parker*, 495 P.3d at 664-67.

Having carefully considered the state court record, the parties' arguments, and applicable law, the Court concludes that § 2254(d) bars relief because the OCCA reasonably applied *Rogers* and its progeny to the facts of this case and reasonably determined the facts presented in state court when it rejected Parker's claim. The Court thus denies the petition as to claim one.

## II.    Claim two:  insufficient evidence that Parker did not act in self-defense

Parker claims the State violated his Fourteenth Amendment right to due process because it did not present sufficient evidence to prove, beyond a reasonable doubt, that he was not acting in self-defense when he shot Wilson. Dkt. 1 at 42-50.[16]

### A.    OCCA decision

The OCCA rejected this claim, reasoning:

> A person is entitled to use deadly force to defend himself or herself "when the person using force reasonably believes such force is necessary to prevent death or great bodily harm to himself or herself or another or to terminate or prevent the commission of a forcible felony." 21 O.S. Supp. 2014, § 733(A)(2). Self-defense is an affirmative defense in which the defendant necessarily admits the elements of the charged homicide crime, but offers a legal justification for the fatal conduct. *McHam v. State*, 2005 OK CR 28, ¶ 10, 126 P.3d 662, 667. Parker maintained in his police interview and during his trial testimony that he shot the victim in self-defense. Based on the evidence, the district court properly submitted the issue of self-defense to the jury and instructed the jury on the State's burden to disprove

---

[16] Respondent contends Parker presents a broader claim in his petition than he raised on direct appeal by arguing (1) the evidence is not sufficient to support each essential element of first-degree manslaughter and (2) the State failed to prove beyond a reasonable doubt that he did not act in self-defense. Dkt. 9 at 60 n.31; *see* Dkt. 1 at 19-50. True, on direct appeal Parker argued only that the State failed to prove beyond a reasonable doubt that he did not act in self-defense. Dkt. 9-4 at 21-25; *Parker*, 495 P.3d at 658. But viewing his petition and reply with the leniency afforded to self-represented litigants, the Court understands claim two as presenting the same claim that Parker presented to the OCCA on direct appeal.

self-defense beyond a reasonable doubt.  *See id.*

> The trial evidence, viewed in the light most favorable to the prosecution, sufficiently proved beyond a reasonable doubt that Parker did not act in self-defense.  Two witnesses to the shooting contradicted Parker's self-defense account.  These eyewitnesses neither heard the victim make any threats nor saw the victim make any kind of threatening movements before Parker shot him.  A rational jury could find, based on the evidence, that Parker's self-defense claim was unworthy of belief because any belief that deadly force was necessary to prevent death or great bodily harm was unreasonable under the circumstances.  Because the evidence was sufficient to disprove Parker's claim of self-defense, his conviction may stand.

*Parker*, 495 P.3d at 658.

**B.**     **Analysis and conclusion**

Parker contends the OCCA's adjudication of this claim resulted in a decision that involves

an unreasonable application clearly established federal law and is based on an unreasonable

determination of the facts presented in state court.  Dkt. 1 at 19-50.  Respondent contends § 2254(d)

bars relief.  Dkt. 9 at 61-63.

The Court finds that § 2254(d) bars relief.  "The Constitution prohibits the criminal

conviction of any person except upon proof of guilt beyond a reasonable doubt."  *Jackson v.

Virginia*, 443 U.S. 307, 309 (1979) (citing *In re Winship*, 397 U.S. 358 (1970)).  Under *Jackson*,

the question for a reviewing court "is whether, after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt."  *Id.* at 319 (emphasis in original).  And, when the state court

has found the evidence sufficient under *Jackson*, the sole question on habeas review is whether

"the state court decision was 'objectively unreasonable.'"  *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)

(*per curiam*) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).  Further, "a federal habeas corpus

court faced with a record of historical facts that supports conflicting inferences must presume—

even if it does not affirmatively appear in the record—that the trier of fact resolved any such

conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326.

Relevant here, and consistent with federal law, Oklahoma law provides that when the "evidence [is] sufficient to submit the issue of self-defense to the jury," the State bears the burden to "prove, beyond a reasonable doubt, that [the defendant] did not act in self-defense." *McHam v. State*, 126 P.3d 662, 667 (Okla. Crim. App. 2005); *see Mullaney v. Wilbur*, 421 U.S. 684, 702-04 & n.29 (1975) (noting that the "majority rule" in states "requires the prosecution to prove the absence of self-defense beyond a reasonable doubt" and holding that "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case"); *United States v. Maryboy*, 138 F.4th 1274, 1290 (10th Cir. 2025) (citing *Wilbur* for the proposition that "[w]hen a defendant sufficiently raises a mitigating defense, like killing in the heat-of-passion or in imperfect self-defense, the prosecution must prove beyond a reasonable doubt the absence of [that defense] . . . . [Otherwise,] the Government [is exempted] from its obligation under the Due Process Clause to prove the defendant guilty of murder beyond a reasonable doubt" (alterations in original) (internal quotation marks omitted)).

Applying legal principles from *Jackson* and *Wilbur* that require reviewing courts to view the evidence in the light most favorable to the State and give due deference to the jury's credibility assessments and resolution of conflicting evidence, and that obligate the State to disprove a defendant's sufficiently raised mitigating defense beyond a reasonable doubt, the OCCA concluded "[a] rational jury could find, based on the evidence, that Parker's self-defense claim was unworthy of belief because any belief that deadly force was necessary to prevent death or great bodily harm was unreasonable under the circumstances" and that because "the evidence was sufficient to disprove Parker's claim of self-defense, his conviction may stand." *Parker*, 495 P.3d

at 658.

Parker vigorously disagrees with the OCCA's assessment of the evidence.  Dkt. 1 at 19-50; Dkt. 16 at 2-11.  He emphasizes his own testimony supporting that Wilson began cussing at Parker when Parker approached the front door of the after-hours club and that Parker saw Wilson reach for his gun before Parker shot him four times; and testimony from himself and other witnesses supporting that Wilson pointed a gun at Parker and threatened to kill him when both men were at the 007 Club before the subsequent shooting at the after-hours club, that Wilson pointed a gun at Lakeisha Carroll as she was leaving the 007 Club before the shooting, that police found a loaded gun in Wilson's pocket after the shooting, and that Parker told Detective Brown he shot Wilson because he thought Wilson was reaching for a gun.  *Id.*  But, as the OCCA noted, "[t]wo witnesses to the shooting contradicted Parker's self-defense account.  These eyewitnesses neither heard the victim make any threats nor saw the victim make any kind of threatening movements before Parker shot him."  *Parker*, 495 P.3d at 658.

Having carefully reviewed the trial record, the Court finds ample support for Respondent's view that the OCCA reasonably applied the legal principles from *Jackson* and *Wilbur* to the facts of this case and reasonably determined the facts presented in state court when it concluded that the State presented sufficient evidence to prove, beyond a reasonable doubt, that Parker did not act in self-defense.  The Court thus concludes that § 2254(d) bars relief and denies the petition as to claim two.

## III.    Claim three:  jury instruction error

Parker claims the state violated his Fourteenth Amendment right to due process because the trial court instructed the jury on the lesser included offense of heat-of-passion, first-degree

manslaughter when the evidence did not support giving that instruction.  Dkt. 1 at 53-81.[17]

## A.    Additional facts and OCCA decision

After the conclusion of the State's evidence, the trial court indicated it did not intend to instruct the jury on lesser included offenses.  Dkt. 10-7 at 141-42.  The prosecutor informed the trial court he would be requesting a manslaughter instruction.  *Id.* at 143.  The trial court heard arguments from both parties and expressed doubt that the evidence would support giving the instruction.  *Id.* at 143-46.  Following a jury instructions conference, and after considering further arguments, the trial court found that the evidence supported an instruction on first-degree manslaughter, heat of passion, and concluded it would give that instruction over Parker's objection.  Dkt. 10-8 at 77-88.  The trial court reasoned:

> The jury could believe several different things.  This is what's been presented to the jury, the jury could, from this evidence, determine that the facts are:  The defendant had a gun pointed at him by the victim and the victim was the aggressor at the 007; that the defendant then left, went home, and got a gun, and came back to settle a score and walked up on a guy with no gun in his hand and started shooting to settle the score.

> That is clear from the evidence and that could be one result the jury finds.  The witnesses at the scene did not see a gun in the victim's hand and the gun really

---

[17] The pages of the petition with supporting arguments for claim three are out of sequence. Parker's argument begins at pages 71-81 and continues at pages 53-70.  Respondent construes claim three as asserting that instructing the jury on first-degree manslaughter resulted in constitutional error for three reasons:  "(1) the evidence at trial did not support the instruction; (2) Parker had insufficient notice of, and therefore no meaningful opportunity to defend against, the charge of First Degree Manslaughter; and (3) the issuance of the instruction was a 'manifestly . . . flagrant[]' violation of Oklahoma's 'own clearly stated law.'"  Dkt. 9 at 64 (citations to petition omitted).  Although Respondent addresses each of these arguments, the Court finds that only the first argument represents the claim Parker presented to the OCCA on direct appeal.  *See* Dkt. 9-4 at 26-31 (arguing trial evidence was not sufficient to support instruction on first-degree manslaughter).  To the extent Parker's petition could be construed as presenting the broader claim identified by Respondent, the Court finds that Parker procedurally defaulted the broader claim and that nothing in the record shows he can overcome the procedural default.  *See Ngo*, 548 U.S. at 92; *Coleman*, 501 U.S. at 750.  The Court thus confines its analysis of claim three to the narrower claim alleging the evidence did not support giving the lesser included offense instruction.

wasn't in the victim's hand, it was in his pocket when he was dead [on] the ground.

The jury could also find that that event happened at the 007, the defendant went home to get a gun so that he would feel protected and that he went back to the after-hours club no knowing or believing or thinking he would run into the same guy.

The jury could believe from the testimony of your client and the testimony the State presented through [Detective] Brown that the victim made some menacing move or furtive movements towards his pocket, and the defendant, from seeing the gun earlier, would have had reason to believe that the gun was in his pocket and he reacted in self-defense, and they could acquit him.

They could also believe that there was something in between and they could believe all of the stuff that I've said before and when the defendant showed up, that he was overcome with a heat of passion or that he imperfectly exercised self-defense, in that whatever emotional state he was in with all of those different emotions going through him, when he saw the victim and the victim made some movement, he perceived it as some type of threat, although the threat was clearly not real, and it was unreasonable, and he reacted in a heat of passion.

And from his testimony and the other testimony the State -- that the jury's heard, they could, based upon the elements of manslaughter first degree, find that that heat of passion substituted premeditation and they could return a verdict of guilty on heat of passion, first-degree manslaughter.

*Id.* at 80-82.

On direct appeal, Parker challenged the trial court's ruling. Applying state law, the OCCA

found no abuse of discretion, and thus no due process violation. It reasoned:

The record shows the district court explained, during a jury instruction conference, that generic imperfect self-defense is not a recognized defense and cited *Mack v. State*, 2018 OK CR 30, ¶ 5, 428 P.3d 326, 328. Although case law does not recognize imperfect self-defense as a separate defense, the district court concluded that this Court's prior cases establish that some form of manslaughter instruction may be appropriate where a self-defense claim fails but the evidence establishes conditions satisfying the elements of manslaughter. *Id.*, 2018 OK CR 30, ¶ 5, 428 P.3d at 328-29. The district court went on to outline three plausible views of the trial evidence, the first two of which were premeditated murder and classic self-defense. The third plausible view of the evidence, according to the district court, was that Parker acted in a heat of passion when he unexpectedly saw the victim again at the after-hours club and that he was overcome with emotion and fear from their earlier encounter, causing him to perceive the victim's movements as a threat, although the threat was not real and his perception was unreasonable.

The district court's analysis of the trial evidence was fair and supported by the record. Parker's contention that the evidence was insufficient to show the existence of any passion, fear, or anger at the time of the shooting from his and the victim's earlier encounter was but one view of the evidence which does not negate other reasonable interpretations. We find, based on the evidence, that the district court did not abuse its discretion in submitting a first[-]degree manslaughter instruction.

*Parker*, 495 P.3d at 659.

### B.    Analysis and conclusion

Parker contends the OCCA's adjudication of this claim resulted in a decision that is contrary to and based on an unreasonable application of clearly established federal law. Dkt. 1 at 53-81. Relying on the same evidence he cited to support claim two, Parker also appears to contend the OCCA's decision is based on an unreasonable determination of the facts. *Id.*; Dkt. 16 at 11-24. Respondent contends § 2254(d) bars relief. Dkt. 9 at 64-67.

Parker has not shown that habeas relief is warranted. "As a general rule, errors in jury instructions in a state criminal trial are not reviewable in federal habeas corpus proceedings." *Ngyuen v. Reynolds*, 131 F.3d 1340, 1357 (10th Cir. 1997). Nonetheless, on habeas review a federal court may consider whether erroneous jury instructions "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)); *see also Maes v. Thomas*, 46 F.3d 979, 984 (10th Cir. 1995) ("A state conviction may only be set aside in a habeas proceeding on the basis of erroneous jury instructions when the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial."). But "[b]eyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation" and the Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990). Relevant here, the Supreme Court has explained that "due process requires that a lesser included offense instruction be given *only* when the evidence

warrants such an instruction.  The jury's discretion is thus channelled so that it may convict a defendant of any crime fairly supported by the evidence." *Hopper v. Evans*, 456 U.S. 605, 611 (1982); *see also id.* at 612 ("The federal rule is that a lesser included offense instruction should be given 'if the evidence would permit a jury rationally to find [a defendant] guilty of the lesser offense and acquit him of the greater.'" (quoting *Keeble v. United States*, 412 U.S. 205, 208 (1973))).  Consistent with federal law, Oklahoma has adopted a "long-standing rule that the trial court should instruct the jury on any lesser offense that is reasonably supported by the evidence, so long as the accused is not unfairly surprised by the lesser-offense theory such that he had no adequate opportunity to defend against it." *McHam*, 126 P.3d at 668.  In *McHam*, the OCCA clarified that, "if the State requests instructions on a lesser related offense, the trial court is free to give them, even over the defendant's objection, so long as they do not unfairly surprise the defense," and "while a defendant is free to adopt an 'all or nothing' strategy with regard to any lesser-offense alternatives, the trial court is not bound by that strategy, and may instruct *sua sponte* on any lesser-related offense it believes to be supported by the evidence, without any formal request by the State." *Id.* at 670.  These principles too are consistent with federal law.  *See, e.g.*, *Keeble*, 412 U.S. at 208 ("Although the lesser included offense doctrine developed at common law to assist the prosecution in cases where the evidence failed to establish some element of the offense originally charged, it is now beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." (footnote omitted)); *United States v. Begay*, 833 F.2d 900, 901 (10th Cir. 1987) (noting that "a trial court is not *required* to give an involuntary manslaughter instruction in the face of a self-defense theory" but also that "a trial court is not *precluded* from giving one when the evidence so warrants."); *United States v. Cooper*, 812 F.2d

1283, 1285 (10th Cir. 1987) ("[T]he trial court instructs the jury in accordance with the evidence
and the applicable law whether requested or not.").

Parker discusses the trial evidence at length and effectively asks this Court to second-guess
the trial court's decision that it supported giving an instruction on first-degree manslaughter. *See*,
*e.g.*, Dkt. 1 at 71-80 (discussing evidence and stating, "There was no prima facie evidence that
warranted the administration of a lesser-included first-degree manslaughter heat of passion offense
instruction."). But "[t]he decision of whether there is enough evidence to justify a lesser included
offense charge rests within the sound discretion of the trial judge." *United States v. Chapman*, 615
F.2d 1294, 1298 (10th Cir. 1980). And the record demonstrates a reasoned exercise of discretion
by the trial court. As the OCCA aptly stated, Parker's argument that the evidence did not support
giving the instruction "was but one view of the evidence which does not negate other reasonable
interpretations." *Parker*, 495 P.3d at 659. To the extent Parker argues the OCCA's decision is
based on an unreasonable determination of the facts or an unreasonable application of clearly
established federal law, the Court disagrees.

Parker also argues that the OCCA's decision is contrary to *Collins v. United States*, 150
U.S. 62 (1893). Dkt. 1 at 65. Parker asserts that *Collins* "established that if the defendant had
enough time between the provocation and the killing to reflect on his intended course of action,
then the mere fact of passion would not reduce the crime below murder." *Id.* In *Collins*, the
defendant was convicted of murder and sentenced to death by hanging after he fatally shot a man
who slapped the face of defendant's younger half-brother. *Collins*, 150 U.S. at 62. The defendant
challenged the trial court's instruction to the jury regarding the distinction between murder and
manslaughter. *Id.* The *Collins* Court succinctly rejected the defendant's claim, stating:

> The facts of this case presented a proper question for the consideration of the jury
> as to whether the homicide was murder or manslaughter. The instruction

24

challenged did not, when taken in connection with the other parts of the charge, present the law inaccurately, for theretofore the judge had charged, substantially, that premeditation was necessary to the crime of murder; and also, quoting from some authority, that 'voluntary manslaughter is the unlawful killing of another without malice, upon sudden quarrel, or in the heat of passion;' and, further, that 'the law, kindly appreciating the infirmities of human nature, extenuates the offense committed, and mercifully hesitates to put on the same footing of guilt the cool, deliberate act and the result of hasty passion.'  In the language complained of, he goes on to say that mere passion does not reduce the crime from murder to manslaughter, for it may be a passion voluntarily created for the purpose of homicide; but it must spring from some wrongful act of the party slain at the time of the homicide, or so near theretofore as to give no time for passion to cool. Applying the rule to the facts in evidence, the instruction was that if the defendant, in a moment of passion, aroused by the wrongful treatment of his brother, and without any previous preparation did the shooting, the offense would be manslaughter, and not murder; but, as is immediately thereafter added, if he prepared himself to kill, and had a previous purpose to do so, then the mere fact of passion would not reduce the crime below murder.

*Id.* at 62-65.

Parker specifically argues that the evidence presented at trial pointed to only one conclusion, namely, that any passion Parker may have felt at the 007 Club when Wilson pointed a gun at him had sufficiently cooled in the time it took Parker to leave the 007 Club, return home to retrieve his gun, and drive to the after-hours club. Dkt. 1 at 53-81; Dkt. 16, at 11-24.  But the OCCA neither applied a rule that contradicts *Collins* nor reached a different conclusion than *Collins* when confronted with a set of facts materially distinguishable from those in *Collins*.  *See House*, 527 F.3d at 1018 (describing when a state court decision is contrary to clearly established federal law).  Here, as in *Collins*, the trial court instructed the jury on the elements of murder and the lesser included offense of first-degree manslaughter, heat of passion.  Dkt. 10-12, at 90, 98-112.  Relevant to Parker's point, the trial court instructed the jury that

There must not be a reasonable opportunity for the passion to cool.  This means that the homicide must have occurred while the defendant was still affected by the passion or emotion.

The homicide must have followed the provocation before there was a time for the emotion to cool or subside.  Whether or not there was a reasonable opportunity for

the passion to cool depends upon whether, under all the circumstances of the particular case, there was such a lapse of time between the provocation and the homicidal act that the mind of a reasonable person would have cooled sufficiently, so that the homicide was directed by reason, rather than by passion or emotion.

The length of time that constitutes a reasonable opportunity for the passion to cool may vary according to the circumstances of the particular case.

*Id.* at 110.  Parker testified that he had "calmed down by the time [he] retrieved [his] firearm from home." Dkt. 10-8 at 51-52.  But he also testified that:  he was "terrified" and "traumatized" by the initial encounter with Wilson at the 007 Club and was "so scared" that he was "shaking" when he walked away from that encounter; he was not sure how long it took him to drive home, retrieve his gun, and drive to the after-hours club; he retrieved his gun and decided to take it with him to the after-hours club because he "felt like [he] needed some protection" and Wilson had "scared the crap out of [him]"; he recognized Wilson almost immediately after he arrived at the after-hours club because he would "never forget the guy" who "put a gun in [his] face"; and he believed Wilson was going to shoot him when he saw Wilson reach for his pocket because Parker "was already terrified" of Wilson based on the initial encounter at the 007 Club.  *Id.* at 18-19, 22, 28-29, 51-52.[18]   As the trial court reasoned, this evidence would have allowed a rational juror to conclude that Parker acted in the heat of passion because there was not "such a lapse of time between the provocation and the homicidal act that the mind of a reasonable person would have cooled sufficiently, so that the homicide was directed by reason, rather than by passion or emotion." *Id.* at 80-82; Dkt. 10-12 at 110.  Thus, as in *Collins*, "the facts of this case presented a proper question for the consideration of the jury as to whether the homicide was murder or

---

[18] Two witnesses who visited both clubs on the night of the shooting testified that the distance between the 007 Club and the after-hours club was roughly two or three miles.  Dkt. 10-6 at 41, 48.  When asked about the time between the initial encounter with Wilson at the 007 Club, the retrieval of his gun and car after being dropped off at home, and the shooting at the after-hours club, Parker estimated it "was a long time."  Dkt. 10-8 at 51-52.

manslaughter." 150 U.S. at 64. For these reasons, the Court finds that the OCCA's decision is not contrary to *Collins*.

Based on the foregoing analysis, the Court concludes that § 2254(d) bars relief and denies the petition as to claim three.

## IV.    Claim eight:  erroneous admission of Parker's post-arrest statements

Parker claims the State violated his Fifth Amendment right against self-incrimination because the trial court denied his motion to suppress involuntary and coerced statements he made to Detective Brown during a post-arrest interview. Dkt. 1 at 143-51.

### A.    Additional facts and OCCA decision

Before trial, the trial court held a hearing, pursuant to *Jackson v. Denno*, 378 U.S. 368 (1964), to determine the admissibility of statements Parker made during a videotaped, post-arrest interview. Dkt. 10-4. The trial court received testimony from Detective Brown and Parker; viewed the videotaped interview; and heard oral arguments. *Id.* at 2, 12-13, 34-38. The trial court described the videotaped interview as consisting of two parts: "one was Mr. Parker with Detective Brown, the reading of the *Miranda* warnings and the invocation of right to counsel," then, following a break, "a second interview" wherein Parker "was reminded of the notification of rights and signed the waiver and talked to Detective Brown" and a second detective, Detective Schilling. *Id.* at 34. Ultimately, the trial court determined Parker's statements were admissible. The trial court found Parker's statements were not coerced, reasoning:

> When I set -- when a trial court sets a [hearing] to determine the voluntariness of the statement, you need to listen to what the defendant testifies what was said to him and what his thought process was and I am considering that.

> But I need to point out, too, that coercion is simply a measure to find out whether the statement was given as a voluntary choice from its maker or the product of coercion or duress. And I will state after watching the video and watching his statement, it's not coercion and it's not duress. [Parker] was very free in his body language. He controlled the topics of conversation. There was times where

27

detectives had to kind of cut in to redirect him.  Not only was he giving his version of events, he was acting it out.  He would get up and demonstrate and act out how he had his hands in the air when he was first confronted and then how everything went.  His contemporaneous acting out of the statement as he is explaining what I would call his self-defense explanation is consistent only with the statement being a product of his choice and the Court finds it's not the product of coercion.  And I rest upon not only the testimony of the officer but also the video I watched, State's 2, the language that he gave, the language he used.  He was clearly coherent.  He understood what was going on.  And as I said, the way he was acting out the story and his whole demeanor while giving a statement is some of the most compelling evidence the Court saw to show that this was a voluntary statement.

*Id.* at 38-39.  The trial court also found that Detective Brown did not improperly reinitiate the interview after Parker invoked his right to counsel.  On that point, the trial court reasoned:

Here was the Court's main focus, quite frankly.  As a matter of law, you may waive right to counsel after you have invoked that right, but you are on -- it's more perilous ground for the State.  And what we have here is an invocation, a clear and unequivocal invocation of the right to counsel.  The tape is turned off and then he later gives a statement after signing the waiver.

. . .

So, as I look at the law, that you can, you can waive your rights after invoking them, it was very important to me again to rely upon Exhibit 2, because as I listened to the testimony of Mr. Parker, he had told me that when the officer came in to give him the card, he had made threats and I don't -- I am not going to sit here and act like I can remember verbatim testimony, but it was something to the effect of "Hey, I've arrested wives and pregnant women before on accessories.  You and I know where this is going."  And his testimony was that it was such a coercive, intimidating environment that he thought his freedom was at stake, and he was overcome with that coercion and he made a statement.  That's the testimony that I heard going in to watch.

Number two.  Number two doesn't bear it out.  In fact, number two, in my estimation, disproves it.  He was not sniffling and crying through this interview and reluctantly answering questions put to him by detectives.  When the detectives came in and said, "Man, I gave you my card and you said you wanted to talk.  Did you want to say something?"  He took the story over.  He was jumping out of his seat to show the body language the way the shooting went down.  Later when the detective followed up, "Why did you want to talk to me if you asked for your right to counsel," he gave the reason, it was weighing on his mind.  He prayed to God and he knew he had to get it off his chest.  And those are the facts that I saw in the interview that I rely heavily upon in finding that the statement not only was not coerced, it was a voluntary choice.

28

But the invocation of right to counsel was overcome by a lawful waiver of your client later on. And I will point out for the record what's obvious -- and I do agree, I accept as fact -- that the detective did return with the card. And the question is, is that an effort to interrogate or further the interrogation, and I found from these facts it's not. And I have to point out, he had already been told, because he asked, he invoked -- "he" being the defendant -- invoked his right to counsel, then asked, "Now what?" And the detective said, "Well, we're going to have to do some stuff. We're going to book you on these warrants and there might be some other stuff coming." It was clear from the context of that conversation and just from reality that there was going to be contact with him and the officers. They had to book him. Well, he was not at the jail, he was at the Detective Division. They were going to have to book him and there was going to be further contact.

Based upon that and the way I viewed the evidence, the return of the officer to talk with him and give him the card was not furtherance of interrogation and it was not trying to reinitiate the interrogation. The defendant reinitiated the interrogation and voluntarily and knowingly waived right to counsel after invocation.

*Id.* at 39-42.

At trial, Detective Brown testified, without objection, about statements Parker made during the interview. Dkt. 10-7 at 11, 27-40. On cross-examination, trial counsel elicited testimony from Detective Brown regarding his interview of Parker's fiancé and questioned Brown as to whether he "made statements and comments to [Parker] that [Parker] took as threats towards [his fiancé] and his family" during an unrecorded portion of the post-arrest interview. *Id.* at 70-75. Brown denied making threatening statements to Parker. *Id.* Parker testified he made statements to Brown after he invoked his right to counsel because Brown threatened to arrest his fiancé. Dkt. 10-8 at 38-40, 60, 63-65, 71-72. The trial court instructed jurors that Parker's statements to Detective Brown "may be considered by you, but only with great caution and only if you determine that it was made voluntarily" and that they should "disregard" the statement to Detective Brown unless they were "convinced beyond a reasonable doubt that the statement was voluntary." Dkt. 10-12 at 88. The trial court further instructed jurors that even if Parker voluntarily and freely confessed, "[a] confession alone does not justify a conviction unless it is corroborated, that is confirmed and

29

supported by other evidence of the material and basic fact or facts necessary for the commission of the offense charged." *Id.* at 89.

The OCCA rejected Parker's Fifth Amendment claim on direct appeal. The OCCA understood Parker's argument as asserting that "the district court denied his motion to suppress and admitted his confession in error" because Detective Brown did not scrupulously honor his invocation of his right to counsel and coerced his statement by threatening to arrest his girlfriend." *Parker*, 695 P.3d at 660. Noting that it would review this claim for plain error given Parker's failure to object at trial to the admission of his statements, the OCCA stated:

> When a suspect unambiguously invokes his or her right to counsel, questioning must cease and police may not resume interrogation of the suspect until the suspect reinitiates further communication or conversations with police or the suspect's attorney is physically present during the interrogation. *Minnick v. Mississippi*, 498 U.S. 146, 156, 111 S. Ct. 486, 112 L.Ed.2d 489 (1990); *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 68 L.Ed.2d 378 (1981). Accordingly, to admit a suspect's statement made after he or she has invoked the right to counsel, the State must show both that the suspect reinitiated discussions with police and that the suspect knowingly and intelligently waived the right previously invoked.

> It was undisputed that the detective advised Parker of his constitutional rights and that Parker invoked his right to counsel ending the first interview. According to the detective, he ceased questioning after Parker invoked his right to counsel. The detective re-entered the interview room later to hand Parker a business card so once Parker had an attorney, he would have the detective's contact information and he could make a statement if he chose to do so. The detective said Parker became emotional and said he wanted to make a statement. The detective stopped Parker, turned the recording equipment on, and obtained Parker's waiver of his rights. The detective was firm that he did not threaten Parker to obtain his statement in the second interview. Parker claimed, however, that when the detective came in to hand him the business card, the detective threatened to arrest his girlfriend which caused him to waive his rights and confess.

> After reviewing the videotape of the interview and considering the testimony of both the detective and Parker, the district court found that Parker reinitiated contact with the detective and knowingly and voluntarily waived his rights. The district court explained that it found quite credible the detective's testimony that he did not threaten Parker. The court also found that Parker's demeanor during the interview was inconsistent with his assertion he had been threatened and coerced. These findings are supported by the record. For these

reasons, we find that the district court did not err in denying Parker's motion to suppress and that relief is not warranted.

*Parker*, 495 P.3d at 660-61.[19]

### B.    Analysis and conclusion

Parker contends the OCCA's adjudication of his Fifth Amendment claim resulted in a decision that "was contrary to and an unreasonable determination of federal law." Dkt. 1 at 143-51.  Respondent contends § 2254(d) bars relief.  Dkt. 9 at 113-22.

The Court agrees that § 2254(d) precludes relief.  The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. Amend. 5.  This same guarantee applies to states through the Fourteenth Amendment's due process clause.  *Malloy v. Hogan*, 378 U.S. 1, 8 (1964).  The Supreme Court has held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  *Miranda v. Arizona*, 384 U.S. 436, 444 (1968). Those procedural safeguards include warnings that the defendant "has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  *Id.*  Inherent in the right to remain silent is a criminal suspect's ability "to cut off questioning" at any time after it has begun by invoking the right to remain silent or requesting an attorney.  *Michigan v. Mosley*, 423 U.S. 96, 100-01 (1975) (quoting *Miranda*, 384 U.S. at 474); *see Miranda*, 384 U.S. at 473-74 ("If the individual indicates

---

[19] According to Respondent, Parker did not include the videotaped interview as part of the record on appeal, so the OCCA relied solely on the trial court's observations and evaluations of Parker's behavior during the interview.  Dkt. 9 at 122 n.56.  Neither party submitted the videotaped interview to this Court, so this Court relies on the trial court's and the OCCA's descriptions of the contents of the interview.

in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."). When law enforcement officers violate these mandates, any subsequent confessions or incriminating statements may be inadmissible at trial. *Mosley*, 423 U.S. at 100-03. The *Mosley* Court emphasized that law enforcement officers must "scrupulously honor[]" a suspect's right to cut off questioning. *Id.* at 104.

"[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards*, 451 U.S. at 484. Rather, an "accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484-85; *see also Minnick*, 498 U.S. at 151 (discussing *Edwards* and stating that its "rule ensures that any statement made in subsequent interrogation is not the result of coercive pressures"). *Minnick* specifically held "that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." 498 U.S. at 153. Nonetheless, "*Edwards* does not foreclose a finding of waiver of Fifth Amendment protections after counsel has been requested, provided the accused has initiated the conversation or discussions with the authorities." *Id.* at 156.

Parker contends "[t]he totality of circumstances indicates the police obtained [his] statement by threats and coercion and by manipulating his vulnerability regarding his family, by suggesting that his failure to tell the truth would result in the arrest of his fiancée and trouble for his children." Dkt. 1 at 151. But Parker provides no clear and convincing evidence to rebut the

trial court's findings that Detective Brown did not reinitiate the interview; that Parker reinitiated the interview after Detective Brown handed him a business card; and that Parker's demeanor in the second portion of the interview, after he signed a written waiver of his *Miranda* rights, evidenced no coercion or duress. *See* 28 U.S.C. § 2254(e)(1) (providing that habeas courts must presume correctness of state court factual findings absent clear and convincing evidence to rebut that presumption). Nor has Parker shown that the OCCA's decision, which relied on the trial court's factual findings, is based on an unreasonable determination of the facts, or an unreasonable application of the legal principles from *Edwards* and *Minnick*. For these reasons, the Court concludes that § 2254(d) bars relief and denies the petition as to claim eight.

## V. Claim four: ineffective assistance of trial counsel

Parker claims he was deprived of his Sixth and Fourteenth Amendment right to the effective assistance of counsel because trial counsel: (1) failed to object at trial to the admission of his statements to Detective Brown; and (2) failed to call an available defense witness, Roosevelt Tolon,[20] who would have provided testimony to support Parker's self-defense claim. Dkt. 1 at 84-92; Dkt. 16 at 24-27.

### A. Additional facts and OCCA decision

At the close of State's evidence, trial counsel informed the trial court that she was "expecting - - at this point," to call two witnesses, Roosevelt and Parker. Dkt. 10-7 at 141. Trial counsel stated she spoke with Roosevelt's attorney, planned for his attorney to find appropriate clothing for Roosevelt because he was in county jail, and anticipated that Roosevelt would be the first defense witness. *Id.* at 141-42. The next morning, the trial court confirmed through a colloquy

---

[20] As needed to avoid confusion, the Court refers to Parker's cousins, both of whom share the same last name, first by their full names, Patrick Tolon and Roosevelt Tolon, and thereafter only by their first names.

with Parker that Parker made a voluntary and knowing decision to testify at trial. Dkt. 10-8 at 4-7. There was no discussion about Roosevelt, and trial counsel presented only one witness: Parker. *Id.* at 3-8, 76-77.

Parker claimed on direct appeal, as he does in this proceeding, that trial counsel provided constitutionally deficient representation by (1) failing to object at trial to the admission of his statements to Detective Brown and (2) failing to call Roosevelt as a witness. Dkt. 9-4 at 57-60. The OCCA rejected Parker's claim. Applying *Strickland v. Washington*, 466 U.S. 668 (1984), the OCCA reasoned, in part, that because it had previously "considered and rejected" his claim that the trial court erroneously denied the motion to suppress his statements, "Parker cannot show prejudice resulting from defense counsel's failure to renew [the suppression motion] during trial." *Parker*, 495 P.3d at 663. As to Parker's allegation that trial counsel should have called Roosevelt as a witness, the OCCA stated:

> Parker also claims defense counsel was ineffective for failing to call his cousin as a defense witness to support his self-defense claim. He asks this Court for an evidentiary hearing to develop this claim. The sole attachment to the motion is an affidavit from an investigator in appellate counsel's office, detailing the anticipated testimony Parker's cousin would provide at an evidentiary hearing. This Court will order an evidentiary hearing only if "the application and affidavits . . . contain sufficient information to show this Court by clear and convincing evidence [that] there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence." Rule 3.11(B)(3)(b)(i), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2021). Where nothing in the supplemental materials alters or amplifies in any compelling way the portrait which emerged from the testimony at trial, this Court will find the materials fail to establish by clear and convincing evidence a strong possibility that trial counsel was ineffective. *Sanchez v. State*, 2009 OK CR 31, ¶ 104, 223 P.3d 980, 1013.

> Parker's defense at trial was self-defense. He claimed self-defense during both his police interview and trial testimony. It is clear from the record that defense counsel was well aware of Parker's cousin's proposed testimony and considered calling him as a witness to support Parker's defense. After the prosecution rested and the district court denied Parker's demurrer, defense counsel stated that she anticipated calling Parker's cousin the following morning. She noted that Parker's cousin was being held in the county jail and that she was working with his lawyer

to obtain clothes.  The next day, however, defense counsel called only Parker. Defense counsel obviously re-evaluated the witness's value and credibility overnight, considering not only his present legal difficulties but also his former convictions.  Defense counsel analyzed the risk verses the reward of having him testify in Parker's case and elected to support Parker's claim of self-defense with Parker's testimony alone.  Defense counsel's action may be easily attributed to trial strategy.  *See Bench v. State*, 2018 OK CR 31, ¶ 198, 431 P.3d 929, 976 (stating which witnesses to call on a criminal defendant's behalf is a matter of trial strategy); *Lee* [*v. State*], 2018 OK CR 14, ¶ 14, 422 P.3d at 786 (stating court will not second-guess matters of trial strategy if there is a reasonable basis for counsel's actions).

Having reviewed Parker's Request for an Evidentiary Hearing and the affidavit offered to support his request, we find that he has failed to meet his burden as he has not shown a strong possibility that defense counsel was ineffective for failing to call his cousin.  Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2021).  Parker is not entitled to an evidentiary hearing to further develop his ineffective assistance of counsel allegations, and his motion, as well as this claim, are denied.  *See Simpson v. State*, 2010 OK CR 6, ¶ 53, 230 P.3d 888, 905-06.

*Id.* at 663-64 (footnote omitted).[21]

## B.    Analysis and conclusion

Parker contends the OCCA unreasonably applied clearly established federal law and unreasonably determined the facts presented in state court when it rejected this claim.  Dkt. 1 at 84-92; Dkt. 16 at 24-27.  Respondent disagrees and urges this Court to deny relief, asserting that "a fairminded jurist could agree with the OCCA's rejection of this claim."  Dkt. 9 at 67-75.

The Court finds that § 2254(d) bars relief.  The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence."  U.S. Const. Amend. 6.  The Supreme Court has interpreted this provision of the Sixth Amendment, applicable to the states through the Fourteenth Amendment, as providing a criminal defendant with

---

[21] The motion for an evidentiary hearing and attached affidavit from the investigator, referenced in the OCCA's opinion, are not included in the record that was provided to this Court. The OCCA noted that, in the affidavit, "[t]he investigator stated that Parker's cousin spoke with defense counsel prior to trial and counsel said she might call him as a witness."  *Parker*, 695 P.3d at 663 n.7.

the right to the effective assistance of counsel.  *See McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) ("It has long been recognized that the right to counsel is the right to the effective assistance of counsel."); *Gideon v. Wainwright*, 372 U.S. 335, 341-44 (1963) (reaffirming that the Sixth Amendment right to counsel is applicable to the states through the Fourteenth Amendment's Due Process Clause).  In *Strickland*, the Supreme Court recognized that "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant."  The *Strickland* Court established a two-part test that requires a defendant to establish (1) deficient performance, i.e., "that counsel's representation fell below an objective standard of reasonableness" and (2) resulting prejudice, i.e., "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 687-88, 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  On habeas review, a federal court's review of a *Strickland* claim is limited because, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Richter*, 562 U.S. at 105; *see also Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) ("[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.").

Because the OCCA applied *Strickland*, "[t]he pivotal question is whether the [OCCA's] application of the *Strickland* standard was unreasonable."  *Richter*, 562 U.S. at 101.  For two reasons, the Court finds that it was not unreasonable.  First, it was reasonable for the OCCA to conclude that trial counsel did not provide constitutionally deficient representation when she failed to object to the admission of Parker's statements to Detective Brown.  As previously discussed,

36

the OCCA reasonably applied *Edwards* and *Minnick* to the facts found by the trial court to conclude that Parker's statements were not obtained in violation of the Fifth Amendment and were therefore admissible. *See supra* discussion section IV; *Parker*, 495 P.3d at 660-61, 663. It therefore was objectively reasonable for the OCCA to further conclude that trial counsel's failure to object at trial to the admission of those statements resulted in prejudice. *Strickland*, 466 U.S. at 694.

Second, it was reasonable for the OCCA to conclude, based on the trial record and materials Parker submitted to the OCCA to support his request for an evidentiary hearing, that trial counsel made an informed strategic decision not to call Roosevelt as a witness. *Id.* at 663-64 & n.7. *Strickland* recognized that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at 690. "For example, trial counsel's informed decision not to call a particular witness is a tactical decision and thus a matter of discretion for counsel." *Newmiller v. Raemisch*, 877 F.3d 1178, 1198 (10th Cir. 2017). "But strategic decisions made after less than a complete investigation are reasonable only 'to the extent that reasonable professional judgments support the limitations on investigation.'" *Id.* (quoting *Strickland*, 466 U.S. at 691). Critically, "[a] state court's finding that an attorney's actions were the product of a strategic decision is a question of fact that must be rebutted by clear and convincing evidence under 28 U.S.C. § 2254(e)(1)." *Id.* at 1200. Parker presents no such evidence here, and the record supports the OCCA's factual finding that trial counsel was aware of Roosevelt's anticipated trial testimony, his status as a pretrial detainee at the county jail, and his prior criminal history when counsel "obviously re-evaluated" his "value and credibility" as a witness and made an informed decision not to present his testimony. *Parker*, 495 P.3d at 663. Moreover, even assuming Parker could rebut the OCCA's finding that trial counsel's decision was based on

reasonable trial strategy, he has not established a reasonable probability that the outcome of the trial would have been different but for counsel's failure to call Roosevelt as a witness. Parker alleges that Roosevelt would have testified that Wilson approached Parker at the after-hours club, began cussing at Parker, and reached for a gun in his pocket before Parker shot Wilson. Dkt. 1, at 88-89; Dkt. 16, at 24. Parker is not wrong that this testimony could have corroborated Parker's testimony about Wilson's alleged actions immediately before the shooting. But, as Respondent points out, Parker's argument assumes that the jury necessarily would have credited Roosevelt's testimony and ignores evidence in the record that conflicts with that testimony. Dkt. 9 at 74. For example, Parker's other cousin, Patrick, testified that he and Roosevelt were parked outside the after-hours club and were sitting together in Patrick's truck when Patrick heard gunshots and that Roosevelt briefly exited the truck "after the shots were fired." Dkt. 10-6 at 73-75, 91-95. And two eyewitnesses to the shooting testified that Wilson made no threatening statements to Parker and made no aggressive movements toward Parker immediately before the shooting. *Parker*, 495 P.3d at 658. Considering the trial record, it was objectively reasonable for the OCCA to conclude that Parker did not establish a reasonable probability that the outcome of the trial would have been different but for counsel's failure to call Roosevelt as a witness.

For these reasons, the Court finds that Parker has not shown that the OCCA's adjudication of his ineffective assistance of trial counsel claim is objectively unreasonable, as a matter of law or as a matter of fact, concludes that § 2254(d) bars relief, and denies the petition as to claim four.

## VI.    Claim five:  ineffective assistance of appellate counsel

Parker claims he was deprived of his Fifth, Sixth, and Fourteenth Amendment rights to counsel, to be present at all critical stages of his criminal proceeding, and to equal protection of the law because appellate counsel:  (1) failed to adequately argue trial counsel's ineffectiveness

regarding the presentation of critical evidence from three witnesses:  Roosevelt, Felicia Buchanan, and Janisha Wilson;[22] and (2) waived Parker's "right to attend and present evidence" at the evidentiary hearing addressing his jurisdiction claim and created a "false" narrative in the post-remand supplemental brief that effectively conceded Parker could not establish his Indian status. Dkt. 1 at 95-110; Dkt. 16 at 27-31.

A.    **Additional facts and state court decisions**

In his application for postconviction relief, Parker alleged appellate counsel:  (1) "waived [his] right to appear at his evidentiary hearing without his consent"; (2) "created her own narrative in  [his] Brief on Remand" and effectively conceded he could not satisfy the recognition prong of the *Rogers* test; (3) failed to utilize available evidence to establish his Indian status; (4) and failed to argue that trial counsel was ineffective for failing to call as witnesses Roosevelt, Janisha, and Buchanan.  *Id.* at 14-18, 21-28.

Applying *Strickland*, the state district court concluded that Parker "entirely failed to develop [his] claims or meet his burden on his application for post-conviction relief to show that his appellate counsel's performance was deficient or that he suffered any prejudice as a result." Dkt. 9-19 at 7-8.  The state district court reasoned that Parker did not establish he was prejudiced by appellate counsel's alleged ineffectiveness in presenting additional evidence at the evidentiary hearing to support his jurisdiction claim.  *Id.* at 8-11.  It further reasoned that appellate counsel was not ineffective for failing to argue that trial counsel should have called Roosevelt as a witness because appellate counsel did, in fact, make that argument.  *Id.* at 11.  Finally, it reasoned that Parker could not show he was prejudiced by appellate counsel's failure to argue that trial counsel

---

[22] Because Janisha Wilson, the victim's wife, shares the same last name as the victim, the Court hereafter refers to her only by her first name.

was ineffective for failing to present evidence, through Janisha and Buchanan, that Wilson (the victim) had a propensity to carry a gun and point it at people, particularly when he was drinking alcohol because that evidence was sufficiently presented to the jury through other witnesses. *Id.* at 11-14.

In his postconviction appellate brief, Parker primarily focused on his jurisdiction claim but appeared to raise a new argument to support that claim by asserting that certain treaties precluded state criminal jurisdiction regardless of his Indian status. Dkt. 9-21 at 2-6. He also argued that the state district court erred in rejecting his ineffective assistance of appellate counsel claim, alleging counsel "failed to address" his treaty-based jurisdiction claim and "failed to raise the issue of trial counsel's failure to call essential witnesses," namely, Roosevelt, Janisha, and Buchanan. *Id.* at 7. But he did not argue in his postconviction appellate brief that appellate counsel prevented him from attending the evidentiary hearing on the jurisdiction claim, created a false narrative that doomed his jurisdiction claim, or failed to present adequate evidence at the evidentiary hearing to support the jurisdiction claim. *See* Dkt. 9-21, generally.

The OCCA summarily rejected Parker's ineffective assistance of appellate counsel claim on postconviction appeal, but appeared to address only a portion of that claim, reasoning that Parker's newly-asserted treaty-based jurisdiction claim lacked merit because Parker "did not adequately establish his Indian status" and that "[t]his conclusion also forecloses [his] assertion that his appellate counsel was ineffective for failing to adequately advocate in favor of his Indian status." Dkt. 9-22 at 5.

### B.    Analysis and conclusion

Parker contends the OCCA's decision is contrary to and based on an unreasonable application of *Strickland* and is based on an unreasonable determination of the facts. Dkt. 1 at 95-

110; Dkt. 16 at 27-31.  Respondent contends § 2254 bars relief to the extent the OCCA adjudicated the merits of any portion of this claim and that Parker procedurally defaulted all portions of this claim that he did not properly present to the OCCA on postconviction appeal.  Dkt. 9 at 75-88. Parker maintains that he properly exhausted all portions of claim five and that, to the extent any portion of claim five is procedurally defaulted, he can overcome the procedural default because he is "actually innocent."  Dkt. 16 at 27-28.

As to that portion of claim five that the OCCA addressed on postconviction appeal, the Court agrees that § 2254(d) bars relief.  In most cases, *Strickland*'s legal principles govern claims alleging appellate counsel performed deficiently by failing to raise or inadequately brief issues on direct appeal.  *Smith v. Robbins*, 528 U.S. 259, 285-89 (2000).  Thus, even if an appellant establishes that appellate counsel performed deficiently, either by omitting or failing to adequately brief a nonfrivolous issue, the appellant must show resulting prejudice, i.e., "a reasonable probability that," but for appellate counsel's deficient performance, the appellant "would have prevailed on his appeal."  *Id.* at 285-86.  The Court finds that the OCCA's decision considered and rejected Parker's allegations that appellate counsel both ineffectively omitted a treaty-based jurisdiction claim and inadequately briefed the jurisdiction claim he raised on direct appeal.  Dkt. 9-22 at 5.  The Court further finds, however, that the OCCA reasonably determined the facts and reasonably applied clearly established federal law when it concluded that the omitted treaty-based jurisdiction claim lacked merit and thus precluded a finding that appellate counsel was ineffective in that regard.  *Id.*; *see United States v. Orange*, 447 F.3d 792, 797 (10th Cir. 2006) (explaining that "[w]hen . . . the basis for the ineffective assistance claim is the failure to raise an issue, [the reviewing court] must look to the merits of the omitted issue" and "[i]f the omitted issue is without merit, then counsel's failure to raise it is not prejudicial, and thus is not ineffective assistance").

And, for the reasons discussed in addressing the substantive jurisdiction claim, the Court finds ample support in the record for the OCCA's conclusion that appellate counsel was not ineffective "for failing to adequately advocate in favor of [Parker's] Indian status." Dkt. 9-22 at 5; *see supra*, discussion section I. Thus, § 2254(d) bars relief as to these portions of claim five.

The Court finds it unnecessary to consider whether Parker procedurally defaulted the remaining portions of claim five or whether he can overcome any procedural default. Even on de novo review, Parker's remaining allegations of ineffectiveness lack merit. *See Fontenot*, 4 F.4th at 1060-61 (noting that federal courts apply de novo review when federal claims, including procedurally defaulted claims, "were not decided on the merits" in state court but further noting that under de novo review "state-court factfinding still receives the benefit of the doubt under § 2254(e)(1)"); *Smith*, 824 F.3d at 1242 (explaining that "where 'the claim may be disposed of in a straightforward fashion on substantive grounds,' [a federal court] retains discretion to bypass the procedural bar and reject the claim on the merits" (quoting *Revilla v. Gibson*, 283 F.3d 1203, 1210-11 (10th Cir. 2002))). The remaining portions of claim five allege appellate counsel failed to argue that trial counsel was ineffective (1) for failing to call as witnesses, Roosevelt, Janisha, and Buchanan; and (2) for waiving Parker's right to appear and present evidence at the evidentiary hearing on the jurisdiction claim. Dkt. 1 at 96-99, 102-10. The record does not support either allegation. First, as just discussed, appellate counsel did argue on direct appeal that trial counsel was ineffective for failing to present testimony from Roosevelt. *See supra*, discussion section V. Thus, as the state district court reasoned, appellate counsel was not ineffective in this regard. Second, the state district court found, and the record shows, that the jury heard evidence through other witnesses regarding Wilson's aggressive brandishing of a gun outside the 007 Club on the night of the shooting Dkt. 9-19 at 11-12. Parker has not rebutted this finding with clear and

convincing evidence.  28 U.S.C. § 2254(e)(1).  Nor could he.  Lakeisha Carroll testified Wilson appeared to be drunk outside the 007 Club, approached her and a friend in the parking lot, pulled out and cocked a gun when Carroll rebuffed his advances, and pointed the gun at another group of people outside that same club.  Dkt. 10-6 at 25-28, 34-39.  Parker's cousin, Patrick, testified he encountered an "irate" Wilson outside the 007 Club, noticed that he had a gun, and later learned from Parker and Roosevelt that Wilson had pointed the gun at Parker and Roosevelt.  *Id.* at 68-69, 85-88.  And Parker testified that Wilson verbally threatened him and pointed a gun at him outside the 007 Club.  Dkt. 10-8 at 15-20.  Even assuming Janisha and Buchanan would have testified about Wilson's propensity to carry a gun and point it at random people while he was intoxicated, evidence regarding Wilson's aggressive actions against Parker and Carroll *on the night of the shooting* arguably provided more compelling evidence to support Parker's theory of self-defense.  Thus, as the state district court reasoned, Parker cannot show he was prejudiced by appellate counsel's failure to raise this allegation of trial counsel's ineffectiveness.  Dkt. 9-19 at 12-13; *see Orange*, 447 F.3d at 797.  Third, as previously noted, the transcript of the evidentiary hearing related to his jurisdiction claim shows that appellate counsel waived Parker's appearance only for the hearing on his motion to continue the evidentiary hearing, Parker appeared at the evidentiary hearing by telephone, and appellate counsel presented substantial evidence at the evidentiary hearing to support the jurisdiction claim.  *See supra* n.12; Dkt. 10-11 (transcript from evidentiary hearing).  There is no factual support for Parker's allegation that appellate counsel waived his appearance at the evidentiary hearing or otherwise prevented him from presenting evidence at that hearing to support his jurisdiction claim.  For these reasons, the Court finds no merit to the remaining portions of claim five.

   For these reasons, the Court denies the petition as to claim five.

## VII.    Claim six:  prosecutorial misconduct

Parker claims flagrant prosecutorial misconduct deprived him of his Fourteenth Amendment right to due process.  Dkt. 1 at 113.  He alleges the prosecutor:  (1) impermissibly shifted the burden of proof by commenting on Parker's failure to present evidence; (2) improperly commented that Parker tailored his defense to the testimony presented at trial; and (3) mischaracterized the evidence by referring to the shooting as an "assassination" and "execution." *Id.* at 113-21.

### A.    OCCA decision

The OCCA noted that Parker preserved this claim for appellate review by objecting at trial to the alleged prosecutorial misconduct.  *Parker*, 495 P.3d at 661.  The OCCA nonetheless rejected Parker's claim, stating, in relevant part:

> This Court will not grant relief on a claim of prosecutorial misconduct unless the misconduct effectively deprived the defendant of a fair trial or a fair and reliable sentencing proceeding.  *Harmon v. State*, 2011 OK CR 6, ¶ 80, 248 P.3d 918, 943.  We evaluate claims of prosecutorial error "within the context of the entire trial, considering not only the propriety of the prosecutor's actions, but also the strength of the evidence against the defendant and the corresponding arguments of defense counsel."  *Lee v. State*, 2018 OK CR 14, ¶ 6, 422 P.3d 782, 785.  We have long recognized that both parties enjoy a "wide latitude in closing argument to argue the evidence and reasonable inferences from it."  *Lamar v. State*, 2018 OK CR 8, ¶ 54, 419 P.3d 283, 297.

> Parker testified that he told his girlfriend everything that happened after the shooting.  The prosecutor asked, during cross-examination, about her ability to confirm Parker's statements as well as Parker's ability to call her as a witness.  The district court sustained each of defense counsel's objections.  The prosecutor later asked Parker about producing a witness to verify his account of the shooting and what he claimed the victim had said.  The district court sustained defense counsel's objection and admonished the jury to disregard the prosecutor's question and reminded the jury that the State had the burden of proof and it never shifted.  During closing argument, the prosecutor argued that jurors did not know "exactly" what was said between Parker and the victim in their encounters and that "[t]he only version" was provided by Parker, "[a]nd, once again, we can't trust it."  The district court, without comment, sustained defense counsel's objection.

> A prosecutor may comment on a defendant's access to evidence and

44

witnesses without impermissibly shifting the burden of proof. *Pickens v. State*, 2001 OK CR 3, ¶ 39, 19 P.3d 866, 880. *See also Bernard v. State*, 1975 OK CR 145, ¶ 10, 538 P.2d 1109, 1112 (stating where a person might be a material witness in defendant's behalf, and the witness is not placed upon the stand by the accused, nor his absence accounted for, failure to produce him as a witness is a legitimate matter for comment in the prosecution's argument). Prosecutors, however, may not comment regarding the conclusions to be drawn from a defendant's failure to call a particular witness. *Thomas v. State*, 1991 OK CR 58, ¶ 24, 811 P.2d 1337, 1344. We need not parse the prosecutor's challenged questions and statements because we have held that "[e]rror is cured where a defendant's objection to improper argument is sustained." *Mack v. State*, 2008 OK CR 23, ¶ 9, 188 P.3d 1284, 1289. Not only did the district court halt the prosecutor's challenged statements, the court properly instructed the jury from the beginning that argument by the attorneys was not evidence. More importantly, the court submitted accurate instructions on the burden of proof throughout trial. The district court's action ending the prosecutor's questions and argument coupled with its accurate opening and closing instructions and interim admonition on the burden of proof remedied any possible error.

Parker argues the prosecutor's reference to the shooting as an "assassination" and an "execution" mischaracterized the evidence and inflamed the passions and prejudices of the jury. The district court did not err in overruling defense counsel's objections because the remarks, read in context, fall within the wide latitude the parties have to discuss and argue the evidence. Nor does the record support Parker's contention that the remarks inflamed the jury as his jury rejected the prosecutor's contention that the shooting was premeditated. No relief is required.

Lastly, Parker argues the prosecutor made improper comments inviting the jury to draw the inference that he concocted his testimony to fit the necessary elements of his defense after listening to the trial evidence. The district court overruled defense counsel's objection to the prosecutor's argument concerning Parker's tailoring of testimony.

Parker maintains the prosecutor's argument unfairly burdened the exercise of his right to be present during trial and denied him a fair trial. Parker acknowledges that the Supreme Court, as well as this Court, have rejected similar claims. *Portuondo v. Agard*, 529 U.S. 61, 73, 120 S. Ct. 1119, 146 L. Ed. 2d 47 (2000); *Hooks v. State*, 2001 OK CR 1, ¶ 43, 19 P.3d 294, 315. He asks us to reconsider our stance in light of the dissent in *Agard* and the opinion of two courts from other states that have found such argument improper. The prosecutor's argument concerning tailoring testimony was not error under *Agard* and the argument challenged here does not provide compelling reasons to reconsider our position in this case. Parker also cites as error the prosecutor's characterization of his testimony as "self-serving" and the prosecutor's argument that Parker was trying to use "magic" words to escape responsibility. The district court sustained Parker's objections related to these latter comments, halted the challenged

argument, and properly instructed the jury on the law, curing any error.

*Id.* at 661-62.

### B.      Analysis and conclusion

Parker contends the OCCA's decision on this claim is contrary to and involves an unreasonable application of clearly established federal law.   Dkt. 1 at 113-21.   Respondent contends § 2254(d) bars relief.  Dkt. 9 at 88-98.

The Court agrees that § 2254(d) bars relief.   In evaluating a claim that prosecutorial misconduct deprived a defendant of his Fourteenth Amendment right to a fair trial, and unless the misconduct infringes on a specific constitutional right, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"   *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *see Underwood v. Royal*, 894 F.3d 1154, 1167 (10th Cir. 2018) (noting that prosecutorial misconduct can result in constitutional error either (1) by infringing on a specific constitutional right or (2) by rendering the trial "so fundamentally unfair as to deny [the defendant] due process").   "An inquiry into the fundamental fairness of the trial requires an examination of the entire proceedings, including the strength of the evidence against the defendant."   *Hanson v. Sherrod*, 797 F.3d 810, 843 (10th Cir. 2015).   "Where the state court has adjudicated the claim of prosecutorial misconduct on the merits, [this Court must] apply [§ 2254(d)'s] deferential standard of review."   *Id.*; *see also Dickerson v. Miller*, No. 22-CV-0074-GKF-SH, 2025 WL 899344, at *9 (N.D. Okla. Mar. 24, 2025)   (unpublished)[23] (noting that "because the federal due process standard provides a general rule of application, state courts have

---

[23] The Court cites all unpublished decisions herein for their persuasive value.  Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

more leeway in applying that rule." (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Parker acknowledges legal principles identified in *Darden* and *DeChristoforo* guide review of a prosecutorial misconduct claim. Dkt. 1 at 113. And it is evident that the OCCA applied these legal principles when it evaluated Parker's claim. *Parker*, 495 P.3d at 661-62. Parker thus cannot show that the OCCA's decision is contrary to clearly established federal law. It is equally evident from the record that the OCCA applied these legal principles to the facts of this case in an objectively reasonable manner. The OCCA carefully considered each aspect of Parker's claim, found that, even if some challenged remarks were improper, the trial court's actions of sustaining objections and carefully and repeatedly instructing the jury about the State's burden to prove guilt beyond a reasonable doubt mitigated any potential prejudice, and found that other challenged remarks were within the wide latitude afforded to attorneys in closing arguments. *Id.*

This Court finds no need to repeat the OCCA's thorough discussion of each allegedly improper comment to determine that the OCCA's application of the federal due process standard is objectively reasonable. *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption" in the law "that jurors follow their instructions"); *Darden*, 477 U.S. at 179-82 (noting that the prosecutor's closing argument, including the prosecutor's use of the word "animal" to describe the defendant and "offensive comments reflecting an emotional reaction to the case," "deserve[d] the condemnation it has received from every court to review it" but "did not deprive [the defendant] of a fair trial"); *Davis v. Roberts*, 579 F. App'x 662, 666-67, 671 (10th Cir. 2014) (finding habeas relief not warranted when prosecutor made references to the defendant's subpoena power and subsequent failure to produce evidence, and concluding that even if such conduct were improper, it was not prejudicial "because the jury was repeatedly instructed by the prosecutor, by defense counsel, and by the court" that the state had the burden to prove the

defendant's guilt).  As these cases suggest, a habeas petitioner bears a heavy burden to show that a state court unreasonably applied the federal due process standard in rejecting a prosecutorial misconduct claim.  On the record presented, the Court cannot say "that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

Further, to the extent Parker reasserts his argument that the prosecutor's tailored-testimony comment infringed upon his Sixth Amendment right to be present at his own trial, the OCCA's decision is consistent with, not contrary to, clearly established federal law.  As the OCCA reasoned, the *Agard* Court expressly rejected this same argument.  *Parker*, 495 P.3d at 662; *see Agard*, 529 U.S. at 73 ("A witness's ability to hear prior testimony and to tailor his account accordingly, and the threat that ability presents to the integrity of the trial, are no different when it is the defendant doing the listening.  Allowing comment upon the fact that a defendant's presence in the courtroom provides him a unique opportunity to tailor his testimony is appropriate—and indeed, given the inability to sequester the defendant, sometimes essential—to the central function of the trial, which is to discover the truth.").

For these reasons, the Court concludes that § 2254(d) bars relief and denies the petition as to claim six.

## VIII.   Claim seven:  discriminatory use of peremptory strikes

Parker claims the State violated the Fourteenth Amendment's equal protection clause, as interpreted in *Batson v. Kentucky*, 476 U.S. 79 (1986), by using the State's peremptory challenges

with a discriminatory purpose to excuse three African-American prospective jurors—Dav.J.,[24]

R.W., and J.Y.  Dkt. 1 at 124-40.[25]

### A.    Additional facts

During voir dire, the trial court asked prospective jurors general questions to determine

their qualifications and if they had knowledge of the facts of the case or relationships with any of

the parties or witnesses.  Dkt. 10-5 at 22-27.  The trial court also asked several open-ended

questions to determine whether any prospective jurors had friends or family in law enforcement;

had prior experiences with the criminal justice system, either as a person accused of a crime or a

victim; had previously served on a jury; or had qualms about considering sentencing options.  *Id.*

at 27-73.  Both attorneys followed up on some of these issues and questioned prospective jurors

on other topics.  *Id.* at 102-224.  At the end of the State's portion of voir dire, the prosecutor asked

each prospective juror to rate his or her view of law enforcement officers "on a scale of one to

ten," with ten signifying "I believe them in every circumstance and I think they're

underappreciated" and one being "I couldn't believe a word they say."  Dkt. 10-5 at 156-60.  Nine

prospective jurors responded with a number less than seven:  A.K., R.W., J.Y., L.F., C.O., Dav.J.,

A.L., J.J., and N.R.  *Id.*  Ultimately, the prosecutor used eight of the State's nine peremptory

---

[24] Two prospective jurors shared the initials D.J.  To avoid confusion, the Court refers to one as Dav.J. and one as Dan.J.

[25] As he did on direct appeal, Parker also asserts that the prosecutor's allegedly discriminatory use of peremptory challenges violated his Sixth and Fourteenth Amendment rights to an impartial jury and a jury drawn from a cross section of the community.  Dkt. 1 at 124; Dkt. 9-4 at 32.  But it is clear from his arguments in the petition, and in his state appellate brief, that *Batson* drives Parker's claim.  *Id.*  The petitioner in *Batson* also alleged he was deprived of his Sixth and Fourteenth Amendment rights to an impartial jury and a jury drawn from a cross section of the community, and the *Batson* Court declined to address those issues, agreeing instead with the State of Kentucky "that resolution of petitioner's claim properly turns on application of equal protection principles."  *Batson*, 476 U.S. at 84 n.4.  The Court follows *Batson*'s lead and likewise applies equal protection principles to consider Parker's claim.

challenges to remove all but one of these prospective jurors; Parker objected to the removal of only three, Dav.J., R.W., and J.Y.  *Id.* at 225-37.

### 1.    Dav.J.

The prosecutor used the State's first peremptory challenge to excuse Dav.J.  Dkt. 10-5 at 226.  In response to questions posed by the trial court, Dav.J. described an incident that occurred in California six years before trial that resulted in him being tasered by a police officer, charged with assault on a police officer, and given probation.  *Id.* at 42-43.[26]  Dav.J. assured the trial court that this incident would not cause him to "disregard" the testimony of law enforcement officers or affect his ability to be fair to the State.  *Id.* at 43-44.  Both attorneys questioned Dav.J. further about the assault and his ability to be fair to the State.  In response to the prosecutor's questions, Dav.J. stated it was "kind of hard to say" how to judge the credibility of testifying police officers because "[t]he law is a little bit different than a person."  *Id.* at 108-09.  He also stated that he thought the officer should not have tasered him, but answered, "No," when asked if he held that officer's conduct against all police officers or viewed police officers differently than most people would view them.  *Id.* at 110-11.  Defense counsel elicited additional information from Dav.J., including that the officer approached Dav.J. from behind during a bar brawl and that Dav.J. hit the officer in the face before he realized the person he hit was a police officer.  *Id.* at 205-07.  Dav.J. rated his view of law enforcement officers at five.  *Id.* at 159.

In asserting a *Batson* challenge as to the removal of Dav.J., defense counsel stated, "[t]here is no reason to excuse him.  There is -- we talked about his assault.  I mean he didn't even know

---

[26] Respondent suggests that Dav.J "recently incurred a criminal charge of Assault on a Police Officer" and was "recently involved in some type of plea bargain with the Tulsa County District Attorney's Office for assaulting a Tulsa police officer."  Dkt. 9 at 107-08.  But the record shows that Dav.J. stated the assault occurred in California six years before Parker's trial.  Dkt. 10-5 at 42-43.

the officer was an officer when he struck him at first. He said it was a reaction and, Judge, we would argue that under *Batson* that [Dav.J] should not be excused." *Id.* at 226. The trial court acknowledged that Dav.J. was African-American, noted that the State was required "to show a race-neutral reason for exclusion," and then offered its own reasons, stating, "he has demonstrated contacts with law enforcement that led to pleas in criminal cases and probation, and I see other reasons as well in the record why he could be excused." *Id.* at 226-27. The trial court then provided the prosecutor the opportunity to "respond with a race-neutral reason" if the prosecutor chose to do so. *See id.* at 227 ("However, if the State wishes to respond with a race-neutral reason, you may."). The prosecutor proffered that he excused Dav.J. based on:

> just the nature of the offense that [Dav.J] testified about committing and his attitude towards police officers, the number that he gave in terms of his trust of police, you know, in conjunction with everything else, we believe that – there are a number of other African-Americans, not all of which we intend to kick, and I would say that there is not a racial reason by the State for kicking [Dav.J.].

*Id.* The trial court stated, "The record demonstrates that the exclusion will remain." *Id.*

The prosecutor used the State's next two peremptory challenges to excuse A.L. and A.K., without objection. *Id.* at 227-28. These prospective jurors rated their views of law enforcement officers, respectively, at five and six and one half. *Id.* at 156, 159.

### 2. R.W.

When the prosecutor used the State's fourth peremptory challenge to excuse R.W., Parker raised a second *Batson* challenge. *Id.* at 228-29. R.W.'s answers to questions posed by the trial court indicated that R.W. had "a few cousins" and "friends" who had been through the prison system, in Tulsa and elsewhere; that he had one cousin in prison at the time of Parker's trial but he was not sure where his cousin was incarcerated; that he personally followed the case of one family member, in the late 1990s, who had been charged with drug and gun offenses and who went to prison; and that nothing about these experiences would affect his ability to be fair to both sides.

51

*Id.* at 48-50.  In response to a question from the prosecutor as to whether any prospective jurors favored strict gun laws, R.W. stated that he would prefer strict gun laws because he does not "want to walk into McDonald's while [his] son [is] playing and see people with firearms."  *Id.* at 122. He further stated that the absence of strict gun laws puts his children in danger and sends the wrong message.  *Id.* at 122-23.  In response to a question from defense counsel, R.W. stated he had previously visited a family member in a county jail in Tulsa, probably in the late 1990s.  *Id.* at 196-97.  R.W. rated his view of law enforcement officers at six.  *Id.* at 157.

The following colloquy occurred regarding the *Batson* challenge as to R.W.:

> [Defense counsel]:  Yes.  [R.W.] is actually Juror No. 11, even though he is seated in Juror No. 10's seat.  He is actually called up as No. 11.  He is also African-American.  There is no reason -- there is no race-neutral reason from his answers that I would say would cause for him to be stricken.  In fact, one of his arguments was is [sic] that we need stricter gun laws was one of the things that he said when he -- during jury selection.  He has had no -- he has not been arrested himself.  He has had no personal contact with law enforcement.  He said he has had some family who have been, had contact with law enforcement , but that was in -- I believe the late '90's was his testimony.  There is no reason for him to be stricken, Judge.

> THE COURT:  He is African-American.  Your race-neutral reason?

> [Prosecutor]:  Judge, for one thing, first of all, his attitude towards guns is one of the race-neutral reasons that we would put forward.  Yes, I understand he wants strict gun laws and -- but that isn't actually the reason we were getting into their attitudes toward guns in an effort to discover whether they would be appropriate in this case.  He has also -- he cited a six, which one of the lowest people on there, in terms of citing their trust of police officers.  He has visited family and friends in prison and has had a number of family members with law enforcement contact.  And I think all of those are sufficiently raised race-neutral reasons.

> THE COURT:  The record demonstrates race-neutral reasons.  I will allow the excusal.  [Defense counsel] was right, he is juror 11, which is seated in 10's spot.

52

*Id.* at 229-30.[27]

Next, the prosecutor excused, without objection, L.F., J.J., R.R., and C.O., all but one of whom rated their trust of law enforcement officers at less than seven. *Id.* at 230-32.[28]

### 3.    J.Y.

When the prosecutor used the State's ninth and final peremptory challenge to excuse J.Y., Parker raised a third *Batson* challenge. *Id.* at 232. J.Y.'s answers to questions posed by the trial court revealed that his younger brother had been in and out of jail in Tulsa for various drug offenses, most recently three or four years before Parker's trial, and that this would not affect his ability to be fair to the State. *Id.* at 47-48. During the State's portion of voir dire, the prosecutor discussed potential limitations on police investigations with prospective jurors and had the following conversation with J.Y.:

> [Prosecutor]: Okay. This conversation I am having: Does everybody agree? Does anybody -- anybody say no, I expect perfection in the investigation? I expect for everything that can be done will be done? Anybody have that expectation?
>
> And look, if you watch enough CSI -- anybody watch CSI? We can get that expectation, can't you?
>
> You're [J.Y.] We moved you. You guys switched, right?
>
> [J.Y.]: Yes, sir.
>
> [Prosecutor]: Yeah. Do you have that expectation, do you think, that the cops should do everything that can be done?
>
> [J.Y.]: Not necessarily, because I know that there is hardships that come with the job and I understand that, like some things can't be done because say like

---

[27] It appears the prosecutor misspoke when he stated that R.W. "has visited family and friends in prison." Dkt. 10-5 at 230. R.W. stated only that he visited a family member in county jail in Tulsa in the late 1990s. *Id.* at 48-50, 196-97.

[28] L.F. and J.J. rated their views of law enforcement officers at five; C.O. rated her view at six; and R.R. rated his view at eight. Dkt. 10-5 at 156, 158-59.

they got a call over the radio and they got to go do that and that one's more important and vice versa.

[Prosecutor]: Okay. Right. They are busy and their time is limited. That's one thing, correct?

What if they deem it unnecessary because they have potentially other evidence that is sufficient to prove the case? In other words, whatever it is they might have, maybe they have -- and again I'm not saying this is what our evidence would be -- let's say they have it on a video with a clear identification on the video and so they don't feel the necessity to do certain other things. I mean --

[J.Y.]: I feel like they should gather -- gather all the information that you can --

[Prosecutor]: Right.

[J.Y.]: -- to help your case.

[Prosecutor]: But you don't expect a perfect investigation, correct?

[J.Y.]: No necessarily, no.

*Id.* at 116-18. J.Y. rated his view of law enforcement officers at six and one half. *Id.* at 157.

In addressing the *Batson* challenge involving J.Y., the trial court and attorneys engaged in the following colloquy:

[Defense counsel]: Judge, I want to object to this. [J.Y.] is now number three out of the four black people we have on this jury that the State has stricken. And if they want to go by numbers, they still have -- [J.Y.] gave a 6.5 in regards to police officers. We have [R.B.] gave a seven.

THE COURT: Ma'am, this isn't litigation.

[Defense counsel]: I know, Judge.

THE COURT: On your choice, make your record. It's the third African-American.

[Defense counsel]: He is the third African-American male that they are now striking from this jury of 12, out of four African-Americans, which were the only four in the entire jury pool. There were no others in the jury pool, including in the back of the room, Judge.

THE COURT: And I don't remember, who is the next one?

54

[Defense counsel]:  The other one is Dan.J.  She is No. 13, Judge.

THE COURT:  I remember her.

[Defense counsel]:  She is the other African-American.  She is the only female we have.

THE COURT:  . . . I think that's right, [Dan.J.] is the remaining African-American and she is a female.

There has been a *Batson* challenge raised.  This is the third African-American that would be stricken.  Do you have a race-neutral reason?

[Prosecutor]:  Yes, Judge.  And again, some of his answers in regard to self-defense, but primarily because he is a 6.5 in his evaluation of police officers.  I would note that we have left Dan.J. on the jury.  She was an eight.  And I believe we have stricken everybody who is below that, that would not end up being an alternate.  So we, obviously, put a lot of stock in that particular question and have kicked virtually everybody in the five to six range.

THE COURT:  What is the race of the victim in this case?

[Defense counsel]:  He's African-American, Your Honor.

[Prosecutor]:  Yes, Your Honor, that is true.

[Defense counsel]:  And actually, Judge, Juror No. 12, right now if we kick [J.Y.], Juror No. 12 would be [N.R.] -- or she is Juror No. 29, [N.R.] and she had a six in regards to rating police officers, Your Honor, so --

[Prosecutor]:  I don't think that's true.  There will be three in the back that will be alternates.  We each kick one, so she is in the alternate pool.

[Defense counsel]:  No, [N.R.] is No. 29.  Right now our potential alternates are 31, 32 and 33, which is [G.M., R.M., and R.S.].

[Prosecutor]:  That's true.  I was backwards on that.  And that is true, [N.R.] is lower.  But again it's not -- it's not the sole reason.  They are both in the six range.

THE COURT: Were there any other reasons on the record for his excusal?  Is that it, the number that he gave?

[Prosecutor]:  Not just the number, Judge, but some of the answers he gave, as I was questioning him about self-defense and motive and intent.  Yeah, Judge, I would also state that his brother -- I think he said his brother has been to prison.

THE COURT:  He is the third African-American member kicked from the

> jury.  There are no other African-American males on the jury.  Trial court hates to weigh in on telling parties how to exercise their challenges and I understand under *Batson* I have to look at the record for race-neutral reasons to strike someone.  There is in the record race-neutral reasons.  But I will point out, counsel for the defense is correct, there were three African-American males on this jury and now they are stricken, that pattern is true.  I find a race-neutral reason.  I will allow the excusal.

*Id.* at 232-35.[29]

The prosecutor also used one peremptory challenge allotted to the State to excuse R.M., one of the three prospective jurors in the alternate pool, without objection.  *Id.* at 236.  R.M. rated his view of law enforcement officers at seven.  *Id.* at 160.  Defense counsel declined the opportunity to excuse a prospective juror from the alternate pool, resulting in two alternate jurors, G.M. and R.S.  *Id.*  These prospective jurors rated their views of law enforcement officers, respectively, at nine and ten.  *Id.* at 160.

### B.    OCCA decision

The OCCA rejected Parker's *Batson* claim.  The OCCA noted that the prosecutor offered reasons for excusing Dav.J., R.W., and J.Y., and reasoned that "the purported reasons for striking these three panelists involved their attitudes toward, and trust/distrust of, law enforcement and their own, or their families', previous contacts with law enforcement and the criminal justice system.  The prosecutor's reasons showed no discriminatory intent inherent in the explanation.

---

[29] Other than the "number," i.e., the six and one half trust rating J.Y. gave, the prosecutor's additional reasons are not supported by the record.  The prosecutor had a lengthy colloquy with several jurors about carrying guns, self-defense, motive, and intent, but there is no indication that J.Y. participated in any part of that discussion or that the prosecutor questioned J.Y. about self-defense.  Dkt. 10-5 at 118-55.  Instead, the prosecutor questioned J.Y. about whether he expects "perfect" law enforcement investigations.  *Id.* at 116-18.  Also, as Respondent acknowledges, the prosecutor apparently misspoke when he stated that J.Y. "said his brother has been to prison."  Dkt. 9 at 102 n.45.  Instead, J.Y. said his brother "has been in and out of jail for like various drug charges."  Dkt. 10-5 at 47.  As further discussed below, a prosecutor's misstatements of the record when providing a race-neutral reason can be considered evidence of purposeful discrimination but do not show that no fairminded jurist could agree with the OCCA's decision in this case that Parker failed to show purposeful discrimination.  *See infra*, discussion section VIII.C.

Thus, the reasons given were race-neutral." *Parker*, 495 P.3d at 659-60. The OCCA stated that this "shifted the burden to Parker to prove purposeful discrimination." *Id.* at 660. The OCCA then discussed legal principles from *Batson* and *Flowers v. Mississippi*, 588 U.S. 284 (2019), and stated:

> The district court observed that the prosecution had struck three African-American males in the venire. The district court stated it "hate[d] to weigh in on telling parties how to exercise their challenges" but understood its role to "look at the record for race-neutral reasons to strike someone." The prosecutor's claim that he put "a lot of stock" in the panelist's trust rating of police is borne out by the record. With the exception of one challenge, the prosecution used eight of its nine peremptory challenges to strike panelists who rated their trust of police at 6.5 out of 10 or lower, including the three African-American panelists. Although not dispositive, the record shows there was an African-American female who served, without challenge, on Parker's jury. The district court, observing voir dire and judging the credibility of the prosecutor, found no discriminatory intent in the peremptory strikes. Given the deference afforded a district court's decision on a *Batson* claim, we find the district court's decision—to accept the race-neutral reasons as sufficient to defeat Parker's *Batson* challenge—was not clearly erroneous. [*Flowers*, 588 U.S. at 302-03]; *Snyder v. Louisiana*, 552 U.S. 472, 477, 128 S. Ct. 1203, 170 L.Ed.2d 175 (2008) (holding "[o]n appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous."). Because the district court did not err in finding no purposeful discrimination in the removal of the three panelists, we reject this claim.

*Id.* at 660.[30]

### C.    Analysis and conclusion

Parker contends the OCCA's adjudication of his *Batson* claim is contrary to clearly established federal law, based on an unreasonable application of that law to the facts of this case, and based on an unreasonable determination of the facts because the State's proffered reasons for excusing Dav.J., R.W., and J.Y. were pretextual, unsupported by the record, and applied equally

---

[30] As the OCCA acknowledged, the prosecutor's decision to not strike the last remaining African-American prospective juror, Dan.J., was "not dispositive" of whether the prosecutor's decisions to strike three out of four African-American prospective jurors were substantially motivated by race. *Parker*, 495 P.3d at 660; *see Flowers*, 588 U.S. at 307 ("In *Miller-El II*, this Court skeptically viewed the State's decision to accept one black juror, explaining that a prosecutor might do so in an attempt 'to obscure the otherwise consistent pattern of opposition to' seating black jurors." (quoting *Miller-El v. Dretke*, 545 U.S. 231, 250 (2005))).

to several non-minority prospective jurors who were not stricken by the State, specifically, N.R., B.C., A.B., S.V., and G.M.[31]  Dkt. 1 at 125-26, 136-40; *see* Dkt. 9-4 at 33-39 (Parker's state appellate brief).  Respondent disagrees and contends § 2254(d) bars relief.  Dkt. 9 at 98-113.

The Court agrees that § 2254(d) bars relief.  "Equal justice under law requires a criminal trial free of racial discrimination in the jury selection process." *Flowers*, 588 U.S. at 301.  Thus, "a State may not discriminate on the basis of race when exercising peremptory challenges against prospective jurors in a criminal trial." *Id.* at 286-87; *see Batson*, 476 U.S. 79.  And, "[i]n the eyes of the Constitution, one racially discriminatory peremptory strike is one too many." *Flowers*, 588 U.S. at 298.  *Batson* requires a trial court to apply a three-step burden-shifting framework to determine whether a constitutional error has occurred:

> First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Although the prosecutor must present a comprehensible reason, "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible"; so long as the reason is not inherently discriminatory, it suffices. Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating "the persuasiveness of the justification" proffered by the prosecutor, but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."

*Rice v. Collins*, 546 U.S. 333, 338 (2006) (internal citations omitted) (quoting *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995) (*per curiam*)).  Appellate courts apply this same framework and, like the trial court, must consider "all of the circumstances that bear upon the issue of racial animosity" in determining whether the opponent of the strike has met his burden at *Batson*'s third step to show

---

[31] As he did in his state appellate brief, Parker identifies N.R., B.C., A.B., S.V., and G.M. as Caucasian.  Dkt. 9-4 at 39-40; Dkt. 1 at 138-40.  The record supports that these prospective jurors were not identified as African-American, however, their specific racial identities are not evident from the record.  *See* Dkt. 10-5, generally.  The Court thus refers to these prospective jurors as non-minorities.

purposeful discrimination. *Snyder*, 552 U.S. at 478. Nonetheless, an appellate court must give a trial court's factual "findings great deference" and sustain the trial court's "ruling on the issue of discriminatory intent . . . unless it is clearly erroneous." *Flowers*, 588 U.S. at 303; *see also Snyder*, 552 U.S. at 477 (discussing the trial court's "pivotal role" in discerning discriminatory intent at *Batson*'s third step which requires the trial court to make credibility determinations based on the trial court's "firsthand observations" of the demeanor of both the prosecutor and prospective jurors). As the *Flowers* Court explained, "enforcing *Batson* rests first and foremost with trial judges." *Flowers*, 588 U.S. at 302.

> The trial court must consider the prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances, and in light of the arguments of the parties. The trial judge's assessment of the prosecutor's credibility is often important. The Court has explained that "the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge." *Snyder*, 552 U.S. at 477, 128 S. Ct. 1203 (quotation altered). "We have recognized that these determinations of credibility and demeanor lie peculiarly within a trial judge's province." *Ibid.* (internal quotation marks omitted). The trial judge must determine whether the prosecutor's proffered reasons are the actual reasons, or whether the proffered reasons are pretextual and the prosecutor instead exercised peremptory strikes on the basis of race. The ultimate inquiry is whether the State was "motivated in substantial part by discriminatory intent." *Foster* [*v. Chatman*], 578 U. S. [488, 513 (2016)] (internal quotation marks omitted).

*Id.* 302-03. The *Flowers* Court also identified evidence that may be probative of discriminatory intent as including:

> • statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case;
>
> • evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case;
>
> • side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case;
>
> • a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing;
>
> • relevant history of the State's peremptory strikes in past cases; or

59

• other relevant circumstances that bear upon the issue of racial discrimination.

*Id.* at 302 (bullet points in original).

A state court's determination at *Batson* step three, that the state did not act with discriminatory intent, "turns on factual determinations." *Foster*, 578 U.S. at 500; *see also Grant v. Royal*, 886 F.3d 874, 949-50 (10th Cir. 2018). Thus, in evaluating the objective reasonableness of a state court decision regarding *Batson*'s third step, "[a] federal habeas court's review of a *Batson* claim is guided by both § 2254(d)(2)'s requirement that the state-court's factual determination must be unreasonable in light of the evidence presented in state court and § 2254(e)(1)'s presumption that a state court's factual findings are presumed correct absent clear and convincing evidence to the contrary." *Cortez-Lazcano v. Whitten*, No. 19-CV-0095-GKF-JFJ, 2022 WL 884921, at *3 (N.D. Okla. Mar. 24, 2022) (unpublished), *aff'd*, 81 F.4th 1074 (10th Cir. 2023).

Having carefully reviewed the transcript of voir dire, applying the appropriate level of deference to state-court factual findings, and for three reasons, the Court finds that § 2254(d) bars relief. First, because the OCCA correctly identified and applied legal principles from *Batson* and its progeny, Parker cannot show that the OCCA's decision is contrary to clearly established federal law. *See House*, 527 F.3d at 1018.

Second, to the extent Parker contends the OCCA either unreasonably applied *Batson* and its progeny or based its decision on an unreasonable determination of the facts presented in state court, the record does not support Parker's contentions. Parker appears, in part, to fault the trial court for proffering its own reasons for the prosecutor's decision to excuse Dav.J. Dkt. 1 at 126-27. The trial court did initially stumble at *Batson*'s second step when it considered Parker's objection to the removal of Dav.J. because it is the prosecutor's role, not the role of the trial court, to provide a race-neutral reason in response to a *Batson* challenge. Dkt. 10-5 at 226-27; *see*

*Johnson*, 3 F.4th at 1224 ("*Batson* means what it says: the court must ask the prosecutor to provide reasons, rather than merely speculating about what such reasons might be."). But this does not render the OCCA's decision objectively unreasonable because it is evident from the record that the prosecutor ultimately provided his own reasons for excusing Dav.J., R.W., and J.Y. Dkt. 10-5 at 226-27. More importantly, the OCCA found, and the record supports, that those "purported reasons . . . involved their attitudes toward, and trust/distrust of, law enforcement and their own, or their families', previous contacts with law enforcement and the criminal justice system" and "showed no discriminatory intent inherent in the explanation." *Parker*, 495 P.3d at 659-60. Even accepting Parker's view that some of the prosecutor's reasons may have been "implausible," *see* Dkt. 1 at 140, that does not preclude a finding, at *Batson*'s second step, that those reasons were race neutral. *See Collins*, 546 U.S. at 338 (explaining that *Batson*'s second step "does not demand an explanation that is persuasive, or even plausible"; so long as the reason is not inherently discriminatory, it suffices").

Third, to the extent Parker contends the OCCA's decision is objectively unreasonable because a comparative juror analysis establishes the existence of purposeful discrimination, the Court disagrees. Parker is correct that a comparative juror analysis can reveal evidence of purposeful discrimination. *Flowers*, 588 U.S. at 302; *see also Miller-El*, 545 U.S. 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise similar non-black who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step."). But clearly established federal law "does not explicitly state that comparative juror evidence, standing alone, must be accorded determinative effect with regard to the question of racially-motivated discrimination—i.e., *Batson*'s third step. In other words, [Supreme Court cases] do not explicitly provide that, if a racial

minority juror and a non-minority juror voice a similar response during voir dire and the prosecutor excludes only the minority juror, that this is conclusive proof of the prosecutor's discriminatory motive." *Grant*, 886 F.3d at 950-51. As in *Grant*, a close review of the voir dire transcript in this case shows the OCCA could have reasonably determined that the excused minority prospective jurors—Dav.J., R.W., and J.Y.—and the five allegedly comparable non-minority prospective jurors the prosecutor did not excuse—N.R., B.C., A.B., S.V., and G.M—"were not similarly situated" with respect to the State's concern regarding trust or distrust of law enforcement officers. *Id.* at 952. The record shows that the State's primary concern was to ascertain whether prospective jurors had negative attitudes toward law enforcement officers and could fairly judge the credibility of law enforcement officers. *Parker*, 495 P.3d at 659-60; *see* Dkt. 10-5 at 106-18, 156-60. The record further shows that the prosecutor addressed that concern by using eight of the State's nine peremptory challenges to excuse prospective jurors who rated their views of law enforcement officers at less than seven. Dkt. 10-5 at 225-37. As the OCCA noted, low ratings were one of the reasons the prosecutor gave for excusing Dav.J., R.W., and J.Y., each of whom gave a rating less than seven. *Parker*, 495 P.3d at 659-60; *see supra*, discussion section VIII.A. Dav.J., R.W., and J.Y., rated their views, respectively, as five, six, and six and a half. Dkt. 10-5 at 156-60. The non-minority prospective jurors whom Parker offers for comparison rated their views as follows: N.R., six; B.C., eight; A.B., "probably eight"; S.V. seven; and G.M., nine. *Id.* Thus, with one exception, the prosecutor exercised all the State's peremptory challenges to remove prospective jurors who rated their views at less than seven. That sole exception was N.R., and, as Respondent points out, the prosecutor appeared to be confused about whether N.R., if not excused, would be in the alternate pool. Dkt. 9 at 109; Dkt. 10-5 at 234-35. Further, as previously discussed, with two exceptions, each of the non-minority jurors that were excused by the State, like Dav.J., R.W., and

J.Y., gave ratings lower than seven. *See supra*, discussion section VIII.A.[32]   Considering only the issue of trust/distrust of law enforcement officers, it was objectively reasonable for the OCCA to conclude that Parker's comparative juror evidence was not compelling.

Parker nonetheless focuses on alleged similarities on a different issue:  whether the prospective jurors either themselves, or through family and friends, had prior experience with the criminal justice system.  Dkt. 1 at 126-38.  But on this issue too, a side-by-side comparison is less than compelling.  No prospective juror, other than Dav.J., had the personal experience of being charged with, and placed on probation for, assaulting a police officer.  The closest comparator identified by Parker is G.M., who ultimately was an alternate juror at Parker's trial.  G.M. stated she too had been through the criminal justice system and placed on probation, in the 1970s, when she "sold liquor by the drink to an undercover officer." *Id.* at 40.  This differs significantly from assaulting a police officer.  Two other comparators identified by Parker recounted remote-in-time experiences that do not even appear to involve criminal charges.  N.R. disclosed that she tried to steal a ring from a store when she was ten years old, and store personnel made her give the ring to charity and threatened that she could "go to juvenile," but no law enforcement officers were involved in that incident.  Dkt. 10-5 at 39-40.  A.B. stated that she "stole a pack of cigarettes"

---

[32] The prosecutor used peremptory challenges to excuse R.R. and one member of the alternate pool, R.M., who, respectively, gave ratings of eight and seven.  Dkt. 10-5 at 156, 160, 231, 236.  These strikes too deviate from the objective of excusing prospective jurors with ratings less than seven.  But the OCCA could have viewed these deviations as less than compelling on the question of purposeful discrimination.  R.R. also stated during voir dire that his wife was a law student then working as an intern for the Tulsa County Public Defender's Office. *Id.* at 78-82.  And the two other members of the alternate pool, G.M. and R.S., rated their trust of law enforcement officers, respectively, at and nine and ten, making R.M. the least trusting of the three potential alternate jurors. *Id.* at 160, 236.

when she was sixteen years old, more than twenty-five years before Parker's trial and described the incident as "the scariest experience of [her] life." *Id.* at 39.

The remaining comparators Parker identifies, B.C. and S.V., were not themselves accused of or charged with any crimes but provided an arguably closer comparison to the experiences of R.W. and J.Y. regarding friends and family members with those experiences. As a reminder, R.W. and J.Y. each stated that he had friends or family members who either had been to jail or had served time in prison. *See supra* discussion section VIII.A. Two non-minority prospective jurors who were not excused by the State recounted similar experiences. B.C. stated that his younger brother had been "charged with drugs and went to Granite [i.e., the Oklahoma State Reformatory] for three years." Dkt. 10-5 at 53-54, 90. B.C. also stated that his brother had been charged for crimes committed in Broken Arrow, had been out of prison for five years, and that B.C. did not follow the case because he and his brother did not "ha[ve] much to do with each other in quite a while." *Id.* at 54. S.V. explained that her daughter had been arrested in Tulsa for drugs about two years before Parker's trial, detained overnight, released, and likely went to court; and that she did not know many details about her daughter's arrest because the arrest occurred when her daughter was a runaway. *Id.* at 65-66. Admittedly, some comparisons can be drawn based on this record. And, as previously noted, the prosecutor appears to have misstated the record when he described R.W. as having visited friends and family members in prison and described J.Y. as having a brother who had been to prison. Dkt. 10-5 at 229-30, 232-35; *see supra* nn. 26, 28. R.W. stated he visited a family member in county jail, not prison. *See supra* n.26. Similarly, J.Y. stated his brother had been in and out of jail in Tulsa, not that he had been to prison. *See supra* n.28. "[A] prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing" can be probative of purposeful discrimination. *Flowers*, 588 U.S. at 302. But even if the prosecutor's

additional reasons for excusing R.W. and J.Y. crumble on closer scrutiny, the facts remain that the prosecutor cited the low trust ratings given by R.W. and J.Y. as the primary reason for excusing each of them, the prosecutor applied that same metric to excuse five non-minority prospective jurors with trust ratings less than seven, and the prosecutor chose not to excuse only one prospective juror who gave a low trust rating, N.R., based (at least in part) on what appears to be the prosecutor's confusion in reading his own jury selection notes and is belief that N.R. would be in the alternate pool.

Considering all relevant circumstances, the Court finds that it was objectively reasonable, as a matter of fact and a matter of law, for the OCCA to reject Parker's claim that the prosecutor exercised the State's peremptory challenges with a discriminatory purpose, in violation of *Batson*. As a result, § 2254(d) bars relief and the Court denies the petition as to claim seven.

### *CONCLUSION*

Based on the foregoing discussion, the Court concludes that Parker has not shown that federal habeas relief is warranted as to any claims in the petition. The Court therefore denies the petition as to all claims raised therein. The Court further concludes that reasonable jurists would not debate the Court's assessment of Parker's constitutional claims. The Court therefore declines to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

**IT IS THEREFORE ORDERED** that:

1. The Clerk of Court shall note on the record the substitution of John Masquelier, Warden, in place of Carrie Bridges as party respondent.

2. The petition for writ of habeas corpus (Dkt. 1) is **denied**.

3. Parker's request for an evidentiary hearing is **denied**.

4.   A certificate of appealability is **denied**.

5.   The motions to expedite ruling (Dkts. 25, 26) are **denied as moot**.

6.   A separate judgment shall be entered herewith.

**DATED** this 4th day of September, 2025.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE